In the Matter of LINDA C., Alleged to be an Abused Child. ROBERT M. TOFT, as Commissioner of the Tioga County Department of Social Services, Respondent; ROBERT C., Appellant.

Third Department, May 13, 1982

### APPEARANCES OF COUNSEL

*Friedlander, Friedlander & Reizes (Peter N. Littman* of counsel), for appellant.

*John F. Sullivan* for respondent.

### OPINION OF THE COURT

LEVINE, J.

The primary issue before us is the validity of the statutory standard of proof in a proceeding under article 10 of the Family Court Act, authorizing the Family Court to make a finding of child abuse on the basis of a preponderance of the evidence (Family Ct Act, § 1046, subd [b], par [i]). Respondent was found to have committed an act of abuse upon his 11-year-old daughter, based almost entirely on her testimony at the hearing concerning sexual molestation and the written statement to the same effect which

she gave to the Department of Social Services, admissible under section 1046 (subd [a], par [vi]) of the Family Court Act.

The issue largely turns on the scope of the United States Supreme Court's recent decision in *Santosky v Kramer* (__ US __, 102 S Ct 1388), and the application of the criteria contained therein for determining whether procedural due process requires imposing a stricter standard of proof when the State seeks to interfere in varying degrees with the parent-child relationship. In *Santosky,* the Supreme Court, by a vote of five Justices to four, held that New York's permanent neglect statute (Social Services Law, § 384-b, subd 4, par [d]; subd 7, par [a]; Family Ct Act, § 622) violated procedural due process in permitting an adjudication terminating parental rights based upon a preponderance of the evidence.

Preliminarily, there can be little question that since the result of an adjudication of child abuse is to enable the State seriously to intervene in the family life of respondent, there is at stake a "fundamental liberty interest protected by the Fourteenth Amendment" (*Santosky v Kramer, supra,* p __, p 1394). This, however, is only the beginning of the inquiry, for "[o]nce it is determined that due process applies, the question remains what process is due" (*Morrissey v Brewer,* 408 US 471, 481). The test to determine what process is constitutionally due involves the balancing of three factors: "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure" (*Santosky v Kramer, supra,* p __, p 1394; *Addington v Texas,* 441 US 418, 425; *Mathews v Eldridge,* 424 US 319, 335).

After considering and weighing each of these three factors, we conclude that the use of a preponderance of the evidence standard of proof in abuse cases does not offend the due process clause, and, because there are significant distinctions between an adjudication of permanent neglect and one of child abuse, in terms of purpose, policy, and effects, *Santosky* does not compel a different result.

## I. PRIVATE INTERESTS AFFECTED

In describing the weight to be given this factor, the majority in *Santosky* stated: "Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened *and the permanency of the threatened loss*". (*Santosky v Kramer, supra,* p __, p 1397; emphasis added). The majority concluded that an adjudication of permanent neglect results all but inevitably in a final, irrevocable, and total destruction of the parent-child relationship. The critical significance of this fact is revealed in the no less then seven separate, specific references to it in the majority opinion.

The result of an adjudication of child abuse in a proceeding pursuant to article 10 of the Family Court Act, however, is not the total and permanent loss of parental rights.\* Under section 1052 of the Family Court Act, various dispositional alternatives are authorized following a finding of abuse. The most drastic of these, placing the child in the custody of a Department of Social Services (Family Ct Act, § 1052, subd [a], par [iii]), is for a maximum of 18 months and, under the case law, should only be invoked "in grave and urgent circumstances", upon proof of the parent's inability to care for the child at the time of the dispositional hearing (*Matter of Carmen,* 37 AD2d 629, 630; *Matter of Urdianyk [Onondaga Dept. of Social Welfare],* 27 AD2d 122, 123). In actual practice, placement is the least frequently employed alternative, occurring in less than one third of the cases in which there was an actual adjudication of child abuse (see Second Ann Report of Chief Administrator of Cts, 1980, Tables 70, 71, pp 77-78). Even when placement out of the home is the disposition selected, the aim is not to destroy the family unit, but to rehabilitate and restore it, the court being authorized to direct agency efforts to strengthen the parental relationship (Family Ct Act, § 1055, subd [c]).

---

\* Termination of parental rights for severe and repeated child abuse may occur under section 384-b (subd 4, par [e]) of the Social Services Law. In that instance, however, the statute imposes a "clear and convincing" standard of proof (Social Services Law, § 384-b, subd 3, par [g]).

We perceive another important distinction between the instant case and *Santosky,* namely the appropriateness of considering the private interest of the child in the outcome. The majority there held that the fact finding in a permanent neglect proceeding "does not purport — and is not intended — to balance the child's interest" (*Santosky v Kramer, supra,* p __, p 1397). Here, the child is the complaining witness in a hearing to determine whether her father sexually abused her. As her father's prime accusor, she hardly fits within *Santosky's* characterization of the child's passive role in a permanent neglect hearing: "At the factfinding, the State cannot presume that a child and his parents are adversaries" (*supra,* at p __, p 1398). It follows from the foregoing analysis that the parent's interest in the outcome is entitled to far less weight here than when permanent neglect is at issue.

### II. RISK OF ERROR

*Santosky* states that the "relevant question" in weighing this facet of the due process test is "whether a preponderance standard fairly allocates the risk of an erroneous factfinding between [the State and the natural parents]" (*Santosky v Kramer, supra,* p __, p 1398). The majority identified three factors as persuasive in suggesting that a stricter standard of proof should apply, namely, (1) the imprecision of the substantive standards of the permanent neglect statute, permitting the Judge to apply his own subjective values; (2) the State's greater litigation resources; and (3) the State's control of the evidence, arising out of its custody of the child during the occurrence of the relevant events (*supra,* at p __, pp 1399-1400). Apart from the comparative inequality of resources existent in any litigation between the State and an individual, a child abuse case does not involve the factors the majority in *Santosky* identified to show that the risk of an erroneous determination against the parent was more severe than the risk of the opposite result. First, the statutory definitions of an abused child (Family Ct Act, § 1012, subd [e], pars [i]-[iii]), phrased in terms of nonaccidental serious physical harm or the commission of a sex offense, are quite concrete and objective. Moreover, it is the parent, and not the State, who controls the evidence, i.e., has "the power to

shape the historical events that form the basis for [the court action]" (*Santosky v Kramer, supra,* p __, p 1399), through control of the child and control of access to the child, when the acts of abuse occur. We also cannot ignore that, typically, child abuse (especially in a sexual form) by a parent occurs in circumstances of total secrecy. Often it is not accompanied by full sexual penetration (such was the child's description in her statement in the instant case). Thus, it is entirely likely that in a child abuse case there will be neither eyewitnesses nor medical evidence to corroborate what in fact took place, and the case will come down to the word of the child against that of the parent. The trier of the facts is not likely to have a high degree of certainty in resolving such one-on-one testimonial confrontations between parent and child. Undoubtedly, this is why there are so few criminal prosecutions for incest. Thus, the risk of an erroneous fact finding in favor of the parent would be substantially enhanced by imposing a stricter standard of proof. A court should be extremely hesitant in bringing this about in child protective proceedings. In his oft-quoted concurring opinion on due process and standards of proof in *Matter of Winship* (397 US 358, 371), Justice HARLAN aptly described the relevant issue when risk of error is the factor under consideration: "Because the standard of proof affects the comparative frequency of these two types of erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each." In the instant case, the result of an erroneous fact finding against the parent will, at most, result in his temporary loss of custody for up to 18 months. The result of an erroneous fact finding in favor of the parent, on the other hand, will be the return of the child to the parent's custody, free of any protective State intervention. In a child sex abuse case, the "social disutility" of such a result approaches the level of absolute abhorrence.

### III. COUNTERVAILING STATE INTEREST

In the *Santosky* case, the majority identified the State's interest in a permanent neglect proceeding as one "to provide the child with a permanent home" (*Santosky v*

*Kramer, supra,* p ___, p 1401). Yet, as the majority noted, until it is clear that the natural family is no longer a viable repository for permanent custody, there is a strong competing State interest, expressed in the statute itself, in preserving the bonds of the natural family. No such ambiguity of State purpose exists in a child protective proceeding based upon child abuse. There, the interest in protecting children from the infliction of serious physical harm or sexual molestation by a parent is the apotheosis of the State's *parens patriae* role. One also cannot ignore that the effect of imposing a stricter standard of proof upon the State will be substantially to inhibit the State's performance of that role, by making successful prosecution of child protective proceedings more difficult. The informed view of specialists and behavioral scientists is that the incidence of sexual abuse within the family is far greater than is ever reported or made the subject of court proceedings (see Giarretto, Humanistic Treatment of Father-Daughter Incest, in Helfer & Kempe [eds], Child Abuse and Neglect, the Family and the Community, p 144; Meiselman, Incest: A Psychological Study of Causes and Effects With Treatment Recommendations, p 30; De Francis, Protecting the Child Victim of Sex Crimes Committed by Adults, Federal Probation [Sept., 1971], pp 15-20). Undoubtedly, all of these factors explain why a substantial majority of State statutes do not impose a stricter standard of proof in child protective proceedings (see Katz, Howe and McGrath, Child Neglect Laws in America, 9 Family Law Quarterly 1, 32 [1975]) and militate against our doing so here.

For all of the foregoing reasons, we hold that New York's use of the preponderance of the evidence standard of proof at the fact-finding stage of a child abuse case does not offend the due process clause.

Since our review of the record discloses that respondent's other points on appeal are without merit, we should affirm.

MAHONEY, P. J., MAIN, YESAWICH, JR., and WEISS, JJ., concur.

Order affirmed, without costs.