OPINION OF THE COURT
Sara P. Schechter, J.
The petition before the court was brought by Brenda Lowell, mother of Susan, seeking visitation and termination of placement prior to the expiration of the initial 18-month term of placement with the Commissioner of Social Services, which was ordered as disposition of a neglect proceeding (Leddy, J.), on December 3, 1982. Susan was found to have been neglected as a result of her mother’s repeated and consistent abuse of drugs and alcohol. Since placement, Susan has been living with her paternal aunt, intervenor herein, who is caring for her as a free family foster parent.
Mrs. Lowell’s circumstances have improved substantially overall since December, 1982. Except for one occasion on March 23, 1983, in which she was intoxicated by alcohol, Mrs. Lowell has not consumed any drugs or alcohol, and has regularly participated in a therapy program. She is now married to Mr. Lowell, and, in December of *444 1983, she gave birth to James. It is clear, however, that continued therapy for her is essential. Mrs. Lowell is controlling an enormous rage, which originated long before the inception of the litigation concerning her child. She has a profound sense of having been wronged, slighted and shortchanged. Banking the fires of this persistent anger consumes a good deal of her emotional energy, which, in turn, limits the depth of her personal relationships.
Of particular concern to the court is Mrs. Lowell’s tendency to lie when she feels threatened. Since Mrs. Lowell’s mother and sister prevaricated to the court even more artlessly and unnecessarily than Mrs. Lowell, it appears likely that Mrs. Lowell was reared in the belief that lying is an acceptable coping device. Unfortunately, Mrs. Lowell not only lies to manipulate the outside world, but she also lies to herself about herself. Although the court fully recognizes the difficulty of parting with an ingrained defense mechanism, such as lying, at a time when one is, in fact, beleaguered, it is essential that Mrs. Lowell come to understand and acknowledge how she has hurt Susan. Outright discharge of Susan to her mother cannot be effectuated until this process is well under way. Only when Mrs. Lowell has faced and forgiven herself will she be able to help Susan forgive her.
The past year has been for Susan a time of healing and growth. Although intelligent and articulate, she is still highly anxious. Her anxiety manifests itself in marked physical restlessness and behavior which is not as controlled as it should be for her age. She also has sad and frightening recurring dreams.
BURDEN OF PROOF
Although many proceedings to terminate plácement within the initial 18-month period must have been decided in the 14 years since section 1062 of the Family Court Act became effective, we have found no published authority dealing with the issue of the substantive burden of proof in such a case.[2] We have concluded that the parent who was previously found neglectful has the burden of going for *445 ward to prove that the conditions on which the neglect finding was based have been remedied; once this has been established, a rebuttable presumption arises that it is in the best interest of the child to return to the parent; the burden then shifts to the agency to prove that return would be detrimental to the child because of some present unfitness of a gravity cognizable under article 10 of the Family Court Act.
To hold narrowly that the only issue before the court is whether the initial conditions of neglect have been corrected, apart from whether present neglect exists, would be inconsistent with the purpose of article 10 “to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being.” (Family Ct Act, § 1011.) Thus, in an extension of placement proceeding, the Family Court extended placement where the respondent mother, although substantially rehabilitated, was so lacking in insight concerning the child’s current emotional situation as to give rise to the reasonable belief that the child would be emotionally abused or neglected if returned to her care. (Matter of Evelyn Q., 100 Misc 2d 1008.)[3]
On the other hand, to pit the parent against the foster parent in a general best interest test would run counter to well-established authority (Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196; Matter of Dickson v Lascaris, 53 NY2d 204; Matter of Male Infant L., 61 NY2d 420), and would represent a serious erosion of rights which are constitutionally protected. (Pierce v Society of Sisters, 268 US 510; Santosky v Kramer, 455 US 745.)
The paternal aunt, who was permitted to intervene in the instant proceeding, has cared for and supported Susan for 18 months as a free family foster parent. She urges the court to consider the neglect finding an “extraordinary circumstance” within the meaning of Matter of Bennett v Jeffreys (40 NY2d 543), and thus, to treat herself and the natural mother as equals in assessing the child’s best *446 interest. With some reluctance, the court must reject this argument. Even if the aunt had outright custody of Susan, it is doubtful that the facts of this case would constitute “persisting neglect” as that term is used in Matter of Bennett v Jeffreys (supra). Here, however, the child is placed with the Commissioner of Social Services of the City of New York, in whom her custody is vested until the expiration of the term of placement. (Social Services Law, § 383, subd 2.)
The fact that Susan is placed with an authorized child care agency brings this case within the ambit of an extensive statutory and regulatory scheme, the initial focus of which is the reunification of the child with the natural parent. This policy is articulated in the statement of legislative findings and intent which prefaces the termination of parental rights statute:
“(ii) [I]t is generally desirable for the child to remain with or be returned to the natural parent because the child’s need for a normal family life will usually best be met in the natural home, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered;
“(in) [T]he state’s first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home”. (Social Services Law, § 384-b, subd 1, par [a].)
It is within this statutory framework, rather than common-law custody precepts, that the present petition must be decided. Even if it were true that Mrs. Lowell could never be as good a parent as the foster mother or provide as well for Susan — of which the court is not convinced — nevertheless, it is the court’s clear duty at this point to acknowledge and reinforce Mrs. Lowell’s efforts to regain custody of her child.
Although the court finds that Mrs. Lowell has carried her burden of establishing that she has overcome the alcohol and drug abuse which were the predicate for the original finding of neglect, the agency, together with the Law Guardian and the intervenor, have proved that immediate discharge of Susan to Mrs. Lowell would result in impairment of the child’s emotional health. Because of *447 Susan’s fragile emotional condition and Mrs. Lowell’s need for additional therapy, as discussed above, discharge of the child must be preceded by a period of graduated visiting and joint therapy.
In lieu of a petition to extend placement, Special Services for Children is to formulate, file with the court and serve on all counsel by May 29, 1984 a detailed discharge plan proposal, with milestone dates for unsupervised visitation, overnight visitation, weekend visitation and trial discharge.
The proposal is to include family therapy for Mrs. Lowell, Susan and Mr. Lowell at Children’s Community Mental Health Society (Staten Island Mental Health Society). Any other service components which Special Services for Children deems significant are to be addressed with specificity in the proposal.
The matter will appear on the Part I Calendar on June 1, 1984 for extension of placement proceedings.

. As to quantum of proof, we strongly believe that preponderance of the evidence is the appropriate standard in all article 10 cases, for the reasons stated in Matter of Linda C. (86 AD2d 356).

. The burden of proof in extension of placement proceedings is upon the agency seeking extension to show both the present inability of the parent to care for the child and that continued placement is in the child’s best interests. (Matter of Nassar v Santmire, 99 AD2d 377; Matter of Sunshine A. Y., 88 AD2d 662; Matter of Yolanda C., 74 Misc 2d 884; Matter of Cynthia B., 39 AD2d 941; Matter of Kenneth G., 39 AD2d 709.)