Froessel, J.
Defendant stands convicted of murder in the first degree, and has been sentenced to death. He was indicted for the killing of one Cornelius Ogletree in the presence of eyewitnesses on the night of August 14, 1959. The decedent’s body was found in the front seat of an automobile parked on 107th Street, Corona, Queens County, New York, with his trousers removed and hung around his neck and shoulders. The cause of death was multiple fractures of the skull produced by a blunt, heavy instrument. A hatchet with traces of blood on it was found on the sidewalk near the parked car.
The evidence adduced at trial establishes beyond any reasonable doubt that defendant did in fact slay Ogletree, and he has not maintained otherwise — rather, his sole defense was predicated on the theory of insanity. In support of his specification of insanity, defendant called as an expert Dr. Harry A. La Burt, Senior Director of Creedmoor State Hospital for the past 18 years. Dr. La Burt testified that he had seen defendant on three separate occasions prior to the trial, and had “ completed a formal investigation into his mental state ’ ’. In addition, he had made a physical-neurological examination of defendant, and had examined his prior hospital records.
He testified that defendant had a history of syphilitic infection dating back to 1942, and that there was evidence of the infection still in his brain; “ there are residuals to brain damage as a result of the syphilitic infection ”. His tests indicated noticeable scarring of the uvula resulting from the syphilitic process and brain involvement. An electroencephalogram showed a mild abnormality of the right side of the brain. Defendant’s history also disclosed that he twice suffered head injuries, once when at the age of 17 he fell from a bicycle and was knocked unconscious, and again, 2 months before the killing, when part of a ceiling fell on his head, again rendering him unconscious. Defendant complained of pains and dizziness resulting from the last injury up to the time Dr. La Burt examined him.
Following his testimony as to defendant’s condition, Dr. La Burt was asked whether a hypothetical person having a similar condition, who had on the night of the killing consumed a considerable quantity of liquor—to wit, 4 glasses in each of which there were about 1% shots of liquor, 2 or 3 drinks from a bottle, *513 and an unknown quantity while in a bar—was laboring under such a defect of reasoning as not to know the nature and quality of his act or that it was wrong. Dr. La Burt stated, in answer to this question: “I’d say that would be entirely possible and quite likely in a case such as you describe.”
The witness explained at some length the basis for his answer, and said he thought the ‘1 individual you described is in a serious mental situation, and I can well imagine that if you add a third substance to it [i.e., to the syphilitic condition and the two trauma] in the form of alcohol he’s pretty much out of control ”. He characterized the hypothetical person as “suffering with pathological intoxication ” — a “ recognized characterization ”.
Dr. La Burt continued by stating that a person with this condition is, at the time of the pathological intoxication, ‘ ‘ insane. He’s not in proper contact with the environment ”. The witness also testified that he would ‘1 definitely ’ ’ say that all that he had stated about the hypothetical person would pertain to defendant.
In addition to the expert’s testimony regarding the hypothetical person, defense counsel sought to elicit from the witness his definite opinion as to defendant’s sanity. Toward this end the following question was asked, although the witness was not permitted to answer it: “ Q. And is it your testimony, Doctor, that this defendant did not know the nature and quality of the act that he was doing on-” The District Attorney’s objection to that question was sustained.
Since Dr. La Burt had previously testified that he had personally examined defendant on three separate occasions, had obtained his medical history, and had examined the records of the Kings County Hospital, including the electroencephalograph tracings, and those of the Elmhurst G-eneral Hospital, it was clearly reversible error for the court to refuse to allow him to testify directly as to defendant’s mental condition at the time of the examination (People v. Faber, 199 N. Y. 256, 266; People v. Keough, 276 N. Y. 141, 145) and at the time of the killing (Penal Law, § 1120; People v. Johnson, 284 N. Y. 182, 184; Freeman v. People, 4 Denio 9, 40).
The error was aggravated by the fact that the court itself asked the People’s expert, Dr. Winkler, for his “ opinion as to whether this defendant knew that the acts he performed on the *514 night of August 14, 1959, were wrong”. Thus the People’s expert was permitted to state his own opinion with regard to defendant’s sanity, whereas the defense expert was not allowed to answer such a question. The prejudice resulting from this is best demonstrated by considering the District Attorney’s argument from this fact during the course of his summation : “ Now, I say to you that there is a big difference in the positive finding as to this defendant that Dr. Winkler was talking about and as to the opinion of both doctors as to the hypothetical man placed in this defendant’s position”. (Emphasis supplied.) It is readily apparent that the District Attorney was attempting to impress upon the jury that a positive finding by an expert who has testified directly as to defendant’s mental condition should be given far greater weight than a mere answer to a hypothetical question.
In seeking to rebut the testimony of defendant’s expert, the prosecutor, as he stated he would do in his opening remarks, called Dr. Winkler, a psychiatrist, who was Chief of the Prison Service in Kings County Hospital and in charge of the Eleetroencephalographic Service. Dr. Winkler testified that he had examined defendant in October or November, 1960, two or three months before the commencement of this trial. He expressly stated that at the time of his examination of defendant the ‘ ‘ question of right and wrong was not put upon us to see whether he knew the nature, the difference between right and wrong”. After objections and some colloquy, the doctor continued: “ Well, at that time when we saw him, we were not concerned with the question whether he knew the difference between right and wrong when he committed the act. We were not concerned at that time when we saw him. We had to examine him and to make a diagnosis and to find out whether he was capable of understanding his charged’ (Emphasis supplied.)
The prosecutor had just previously inquired of the doctor whether he had come to a conclusion as to defendant’s ability to understand the nature and quality of his acts. The witness stated: £ £ The conclusion was that the man was capable of understanding his charge. ’ ’ Dr. Winkler subsequently repeated this statement on two more occasions — once in response to another question of the prosecutor, and once in response to the court’s question whether he had found defendant capable of understanding his charge.
*515 Although the introduction of this testimony into the case, over repeated objections by defense counsel, clearly constituted reversible error (Code Grim. Pro., § 662; People v. Draper, 278 App. Div. 298, 305, affd. 303 N. Y. 653), the matter did not end there. In summation the District Attorney stated:
“ Now, I don’t think there is any question about the fact that you know we don’t try an insane man for any crime if we know it. And I don’t want any inference drawn by any of you people that this man is insane because of any statements made by Mr. Greenberg.
“As a matter of fact, the contrary is true. And what Dr. Winkler was talking about when Mr. Greenberg was talking about his testimony was that when Dr. Winkler examined this man in November of, or October whenever it was, he found him to understand or be capable of defending himself. That’s what he said he found this particular man, and that’s what the question was-” (emphasis supplied).
Defendant’s objection and motion for a mistrial at this point were improperly overruled and denied. Thereafter, in his charge, the court compounded the error of receiving this testimony by charging that Dr. Winkler “ examined the defendant on three occasions shortly after the alleged crime and found that he was capable of understanding the nature of the charges and proceed with the defense ” — an issue wholly irrelevant, and its admissibility forbidden by statute. The fact that no exception was taken to this erroneous charge does not preclude us from considering its prejudicial effect in this capital case.
In view of the foregoing serious errors, consisting of the exclusion of evidence and the allowance of inadmissible and highly prejudicial testimony with respect to the major issue in the case — defendant’s alleged insanity, it is unnecessary for us to discuss the clear inconsistency of Dr. Winkler’s testimony and other errors urged upon us by defendant.
The judgment of conviction should be reversed and a new trial ordered.