OPINION OF THE COURT
Dominic R. Massaro, J.
Huwe Burton is accused of matricide. His mother died as a result of separate stab wounds to her neck. On two occasions in as many days, young Burton was interviewed by the police. As he was preparing to leave the police station on the second *682 occasion of interview, defendant stated, "I want to tell you the truth, really what happened.” He thereupon confessed to the murder (Penal Law § 125.25).
During the trial, Mr. Burton announced his intention to introduce the testimony of a psychiatrist on a theory of "acute grief’ to show that his confession was not truthful.
By the instant motion the People seek to preclude. They claim that the expert’s theory does not meet the standard of reliability for the admissibility of scientific testimony in New York.
Defendant argues that "soft” scientific evidence, such as testimony explaining human behavior, is amenable to a more liberal standard: that psychiatry enjoys general acceptance in the field of medicine, and thus explanatory testimony is relevant because it will be helpful to the jury; and that the jury should be allowed to make its own factual determination as to its reliability. He urges that the theory should go to weight rather than admissibility. Further, that the judicial process of limiting instruction, vigorous cross-examination, and refutation by experts the People may wish to call, can combine to avoid undue influence in prejudicing or misleading the jury.
A complicated question regarding the admissibility of complex and confusing "novel” scientific evidence must now be resolved.[1] On a record-supported factual finding, the court grants the People’s motion to preclude.
I
While the jury’s role as the sole finder of fact has been vigorously defended, courts of this State have allowed the introduction of expert opinion on an ultimate issue where it is necessary to "help * * * to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of a typical juror” (People v Taylor, 75 NY2d 277, 288 [1990]).
Preliminarily, it must be demonstrated that the evidence from which an expert opinion is drawn is probative. In assessing scientific evidence, its probative value is inexorably intertwined with the validity or the reliability of the methodology *683 from which it derives. If the principle or the procedure underlying its employment is not valid, then the evidence is not relevant, and, therefore, inadmissible.
Upon the People’s objection to the competency of the proffered testimony, the court directed a preliminary hearing to determine what, if any, scientific reliability may be attached to the expert opinion (see, Frye v United States, 293 F 1013 [DC Cir 1923];[2] accord, People v Leone, 25 NY2d 511 [1969]; compare, United States v Two Bulls, 918 F2d 56 [8th Cir 1990]; People v Castro, 144 Misc 2d 956 [Sup Ct, Bronx County 1989]).
II
Before analyzing problems surrounding the admissibility of novel scientific evidence, "hard” or "soft,” a review of the particular scientific evidence at issue is in order.
The concept here sought to be introduced is nontraditional and highly technical; it is far beyond the realm of ordinary experience. The ability of a jury to quickly grasp and comprehend and accord appropriate weight to "acute grief syndrome,” that is, the mental operation of the mind claimed to arise from emotional sequelae and affecting human behavioral patterns cannot be assumed. Under circumstances such as these, a lay jury may well rely to an even greater degree on the expert, and the weight of his opinion may be credited without critical scrutiny. Yet, the court is not unmindful that to mandate exclusion of a relevant mental condition can impinge on the right of a defendant and raise a Sixth Amendment issue, specifically, the right to present an effective defense (see, Chambers v Mississippi, 410 US 284 [1973]; Washington v Texas, 388 US 14 [1967];[3] US Const 6th Amend; Civil Rights Law § 12).
*684 Dr. Joel Feiner was the sole witness. His credentials combine to otherwise merit the advancing of a medical opinion. But he candidly admitted that no court has ever qualified him on the specific issue of credibility, and it is here that his theory must find scrutiny.
The witness testified as to his methodology: personal assessment utilizing the fundamental tool of psychiatry, namely, the time-honored clinical interview technique. Dr. Feiner concluded, from his "comprehensive evaluation”, that Mr. Burton’s confession was untruthful. He roots this opinion in psychological compulsion.
Acute grief can manifest a traumatized psychological state that would cause an individual to confess to a crime that he did not commit, the doctor advances. In concluding that the confession is untrue, Dr. Feiner informed the court that he could so state with a "great deal” of certainty.
The issue presented then, is whether the "novel” theory respecting defendant’s credibility, namely, theoretical evidence whose scientific fundamentals are not suitable candidates for judicial notice, meets the standard for admissibility of expert psychiatric testimony under current New York law.
Ill
In determining the admissibility of novel scientific evidence, New York follows the rule set forth in Frye (supra). In this seminal decision, the court held (supra, at 1014): "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define . . . and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs” (emphasis added).
In essence, Frye (supra) predicates the admissibility of scientific evidence on the assumption that "general acceptance” in the scientific community is indicative of reliability to allow an opinion of evidential force to be asserted in the courtroom. Our own Court of Appeals explained the prevailing Frye standard governing New York law: "[T]he test is not whether *685 a particular procedure is unanimously indorsed by the scientific community, but whether it is generally acceptable as reliable” (People v Middleton, 54 NY2d 42, 49 [1981]).
In recent years, however, this standard has been subject to critical analysis, limitation, modification, and, in some instances, outright rejection.[4] Federal legislation in 1975 has intensified this process, giving rise to a more permissible standard of "reasonable reliance” in place of "general acceptance” for determining admissibility (see, Federal Rules Evid rule 703).[5]
The adoption of the companion Federal Rules of Evidence rule 702,[6] which is silent on the applicability of the Frye standard, has plainly broadened the parameters of admissibility by incorporating a "helpfulness” test, that is, expert testimony is relevant even if the issue is within the ordinary, unaided comprehension of the jury, as long as it will be of assistance.
It has thus been argued by some commentators that Frye (293 F 1013, supra) is no longer the rule;[7] and a number of courts have abandoned it in favor of a lower threshold approach.
*686 Unsurprisingly, other courts still maintain that ”[t]he trial court should not be used as a testing ground for theories supported neither by prior controlled] experiments nor by calculations with indicia of reliability” (United States v Tranowski, 659 F2d 750, 757 [7th Cir 1981]). They still predicate the admission of scientific evidence on the Frye standard of general acceptance in the scientific community, and, to this day, it remains the majority rule in both Federal and State courts.
In New York, the Frye standard has not been superseded by the Federal rules (see, People v Middleton, supra; Proposed Code of Evid for State of NY [1991]). A more cautious approach, one even more stringent than Frye (supra) has been advanced where "hard” scientific evidence is proffered (see, People v Castro, 144 Misc 2d 956, supra).
IV
Generally, a qualified expert may present an opinion as to mental condition when it is in issue (see, People v Jackson, 10 NY2d 510 [1962]). However, our courts have been reluctant to extend the range of situations in which the expert testimony of a psychiatrist is deemed proper (see generally, Fisch, New York Evidence § 423 [2d ed 1977]). Indeed, a more demanding level of reliability has been imposed where the scientific evidence presumes to test the credibility of a participant in a criminal act.[8] In this setting, our Court of Appeals has established "a very high level of reliability, tantamount to certainty as a predicate for its admissibility” (People v Hughes, 59 NY2d 523, 542 [1983]).
In People v Williams (6 NY2d 18 [1959], cert denied 361 US 920 [1959]), the defense sought to introduce testimony of a medical expert to show that mainliners addicted to heroin are unworthy of belief. The Trial Judge refused to allow the testimony. The Court of Appeals held (supra, at 23) that the trial court was correct, and stated that "[credibility is, as the cases have repeated and insisted from the dawn of the common law, a matter solely for the jury * * * The necessity, therefore, for caution in expanding * * * the settled and well-tested methods of impeachment becomes apparent. Such expert testimony would unquestionably have great impact upon *687 a jury and, to some unknowable extent, replace their judgment by the opinion of the expert * * * upon the collateral matter of credibility * * * the jury * * * at the very least, would tend to regard the opinion of the expert as determinative of the credibility of the witness rather than to consider it only as one factor of many to be considered in concluding whether a witness is telling the truth. Laymen, even with the aid of a charge by the court, may not reasonably be expected to apply all of the refined legal reasoning which would be necessary to place such testimony in its proper perspective and give it only its limited significance * * * it overdevelops a collateral matter and tends to obscure the real issues.” (Supra, at 26-27.) The court did not state that expert testimony relating to collateral issues of credibility must always be excluded; rather, such testimony is admissible, but only if the proffered opinion is the consensus of the medical or scientific community (see, People v Leone, 25 NY2d 511, supra). There is a dearth of case law authorizing such testimony. Indeed, the general rule in New York is that all questions of credibility are left to the finder of facts.
In People v Ciaccio (47 NY2d 431, 439 [1979]), the trial court permitted expert testimony by a detective that it was "not unusual” for truck hijackers to "offer to give the driver of the truck $100 for his co-operation in reporting to the police that two Blacks had done the robbery”. The Court of Appeals set aside the conviction of the defendant, holding that it was error to admit this testimony. The Court stated that "[t]his 'opinion’ evidence was the precise equivalent of affirming the credibility of the People’s witness * * * It is always within the sole province of the jury to decide whether the testimony of any witness is truthful or not. The jurors were fully capable of using their ordinary experience to test the credibility of the victim-witness; and the receipt of the detective’s testimony in this regard was indeed improper and constituted usurpation of the function of the jury.” (Compare, People v Parks, 41 NY2d 36 [1976]; see generally, Berger, United States v Scop: The Common Law Approach to an Expert’s Opinion About a Witness’s Credibility Still Does Not Work, 55 Brooklyn L Rev 559 [1989].)
In People v Graydon (43 AD2d 842, 843 [2d Dept 1974]), the Court held, in reversing a judgment of conviction for manslaughter, that "it was highly prejudicial for the People to elicit testimony on redirect examination from their expert psychiatric witness to the effect that he had found defendant’s *688 version incredible and for the witness to explain the reason for that conclusion to the jury.” (See also, People v Knupp, 179 AD2d 1030.)
V

t

Whether the Frye test should apply to "soft” scientific evidence, a type of evidence for which it was not originally developed, is yet an open question. Notwithstanding, unlike "rape trauma syndrome” (People v Taylor, 75 NY2d 277, supra); or "sexually abused child syndrome” (Matter of Nicole V., 71 NY2d 112 [1987]); or "battered woman’s syndrome” (People v Torres, 128 Misc 2d 129 [Sup Ct, Bronx County 1985]); or "battered child syndrome” (People v Henson, 33 NY2d 63 [1973]), the field of knowledge relating to "acute grief syndrome” has neither sufficiently been classified nor developed to be an apt subject for judicial notice; nor has there been a clear and convincing showing that its reliability enjoys any requisite standing to allow expert testimony on its consequences. (Compare, People v Castro, 144 Misc 2d 956, supra [DNA test results admissible]; People v Mertz, 68 NY2d 136 [1986] [breathalyzer test results admissible]; People v Smith, 63 NY2d 41 [1984] [bite mark comparison techniques admissible]; Matter of Abe A., 56 NY2d 288 [1982] [results of blood grouping tests admissible]; People v Allweiss, 48 NY2d 40 [1979] [identification based on hair analysis admissible], with People v Campbell, 73 NY2d 481 [1989] [Dupont ACA test not generally reliable for determining blood alcohol content]; People v Hughes, 59 NY2d 523, supra [hypnosis not generally accepted as valid method to refresh memory]; People v Tarsia, 50 NY2d 1 [1980] [voice stress tests not generally reliable]; People v Leone, supra [reliability of lie detector test not sufficiently established].)
After an inquiry on the reliability of a theory of acute grief, the court, in questioning its propriety, finds no proof to assume that it enjoys a foundation outside the courtroom to be accepted inside it. Of this there can be little doubt: justice cannot be premised on an abstraction that has not been shown to enjoy any significant support other than the claim of its proponent.[9] General acceptance must at least constitute a standing alternative to the despotism which all theories generate when elevated to the status of judicial notice.
*689 Initially, there is no testimony by Dr. Feiner outlining a theoretical framework formulative of his hypothesis. Adherence, let alone scrupulous adherence, to scientific investigation has not been shown. Thus, the court is unpersuaded, protestations of utilizing the time-honored clinical interview technique notwithstanding, that a sufficient foundational basis exists to permit the theory’s admissibility. The proffered evidence of "acute grief syndrome” is fundamentally unsupported: the collection of a database, its analysis, the analytical framework for interpreting results, these hallmarks of the scientific method minimizing the possibility that bias will affect conclusions are sorely lacking.
Be minimis citations of general diagnostic textbooks as opposed to the existence of specialized literature reflecting treatises, reports, workshop results or validated data of any compilation; reliance on an informally classified psychiatric condition without diagnostic criteria and known as "uncomplicated bereavement”[10] as opposed to an analogous relationship with other types of syndromes that are routinely admitted into evidence; the lack of clarity with which the theory finds expression; the breadth of the inferences it presupposes to predict as consequences without corresponding verification of its premises, these factors collectively accrue to convince this court that experts in Dr. Feiner’s discipline would not, indeed yet do not, deem his theory beyond the realm of isolated speculation without " 'a level of reliability sufficient to warrant its use in the courtroom.’ ” (See, and compare, United States v Jakobetz, 955 F2d 786, 797 [1992], quoting United States v Williams, 583 F2d 1194, 1198 [2d Cir 1978].)
Respecting the time-honored clinical interview technique upon which defendant places great store, it first must be observed that general acceptance of the reliability of a technique does not per se equate with general acceptance of the *690 underlying scientific theory to which the technique is applied. Nor does the record reveal any testimony elicited to indicate that the technique advanced in this instance is referrable to quantitative measurements) or weight(s) of values that equate even with less stringent standards an expert in the field might reasonably be expected to utilize in support of a proffered theory, and in forming and rendering a reliable, accurate and meaningful opinion thereon.
While the clinical interview technique is the cornerstone of psychological assessment, and is considered the most reliable means to gather "soft” information, the expert was forced to concede its inherent limitations.
In sum, Dr. Feiner’s testimony is wholly bereft of any proof that either he or experts in the relevant scientific community have validated a methodology of clinical interview respecting credibility demonstrative of the required level of reliability. Therefore, it is highly unlikely of probability, particularly where New York’s "tantamount to certainty” test for questions of credibility must be satisfied.
In the realm of novelty, special challenges are presented. The risk of admitting as "explanatory” palpably untrustworthy opinion is deemed unacceptably high where the jury can be misled with an aura of certainty, glossed by a psychiatric diploma and the facade of superior knowledge, to overestimate its probative value and obscure its merely conjectural nature. Lay jurors tend to give considerable weight to novel "scientific” evidence when presented by "experts” with impressive credentials.[11] In any event, unreliable evidence does not satisfy the definition of relevancy.
Implicit is the proposition that expert testimony based on speculation devoid of factual underpinnings and/or unconfirmed by scientific proof cannot form a rational basis for establishing credibility in a court of law. Clearly, the courtroom is not an appropriate setting to break ground that has not been broken in the laboratory or in the workplace.
Mr. Burton’s further contention, that the evidence has *691 potential to assist the jury and should, with adequate instruction, be tested through cross-examination and countervailing expert testimony is rejected. It is not the prevailing New York standard. Furthermore, the testimony is not necessary; it merely tracts the same analytical process of which the trier of fact is fully capable (see, People v Taylor, 75 NY2d 277, supra).
A jury charged with the assessment of the veracity of Huwe Burton is not dependent on special knowledge now otherwise garnered from ordinary understanding of life experience and general intelligence (see, People v Cronin, 60 NY2d 430 [1983]; Dougherty v Milliken, 163 NY 757). While it might be suggested that psychiatric professionals are well equipped to vouch for the credibility of a witness, to allow such testimony in this State is clearly improper (see, People v Hughes, 59 NY2d 523, supra; People v Leone, 25 NY2d 511, supra; see also, United States v Azure, 801 F2d 336 [8th Cir 1986]); it equates with constituting a trespass on the jury’s sole domain (see, People v Williams, 6 NY2d 18, supra; see also, United States v Richter, 826 F2d 206 [2d Cir 1987]). There is no indication on this record that the court should otherwise treat with it.
Accordingly, the proffered testimony of Dr. Joel Feiner will not be received in evidence.

. It is noted that the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3d rev ed 1987) does not list "acute grief’ as a classified emotional condition or disorder.

. Frye (supra) dealt with the admissibility of data from a precursor to the polygraph. Its test was formulated to deal with "hard” scientific evidence, that is, scientific evidence utilizing machine or other nonhuman indicators. This two-page criminal decision set the standard by which a majority of courts have judged scientific evidence since 1923. Only on rare occasions until quite recently did courts discuss the test in the context of "soft” psychiatric evidence.

. Both Chambers (supra) and Washington (supra) are susceptible of narrow readings, the court(s) not formulating any test in resolution of the clash between a defendant’s right to introduce evidence and state evidentiary rules. With respect to nontraditional psychological evidence, defendants’ claims of a constitutional right to present such evidence has met with mixed success. (See, People v Brooks, 128 Misc 2d 608 [Westchester County Ct 1985] [defendant allowed to present testimony concerning the fallibility of eyewitness identification].) *684 See also, Churchwell, The Constitutional Right to Present Evidence: Progeny of Chambers v Mississippi, 19 Crim L Bull 131 (1983); Clinton, The Right to Present a Defense: An Emergent Constitutional Guarantee in Criminal Trials, 9 Ind L Rev 711 (1976).

. McCormick, Evidence § 203 (Cleary 3d ed 1984); Weinstein, Evidence ¶ 702 (03) (1986); see also, Richardson, Evidence, 1985 Cum Supp, § 367 (Prince 10th ed); People v Mooney, 76 NY2d 827, 829, n 1 (Kaye, J., dissenting 1990); Capra, Proposed New York Code of Evidence: (Part II), NYLJ, May 15, 1990, at 3, col 1; cf., People v Fisher, 53 NY2d 907 (1981).

. "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence” (Fed Rules Evid rule 703).
Consequently, rule 703 removes much of the common-law protection against improper opinions.

. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise” (Fed Rules of Evid rule 702).

. McCord, Syndromes, Profiles and Other Mental Exotica: A New Approach to the Admissibility of Nontraditional Psychological Evidence in Criminal Cases, 66 Ore L Rev 19 (1987); Curran, The Acceptance of Scientific Evidence in the Courts, 309 New England J Med 713 (1983); McCormick, Scientific Evidence: Defining a New Approach to Admissibility, 67 Iowa L Rev 879 (1982); Giannelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later, 80 Colum L Rev 1197 (1980); Note, Changing the Standard for the Admissibility of Novel Scientific Evidence: State v. Williams, 40 Ohio St LJ 757 (1979); but see, Louisell and Mueller, Federal Evidence § 105 (1977).

. Historically, the common-law courts were highly skeptical about this sort of testimony. (See, e.g., Wigmore, Professor Muensterberg and the Psychology of Testimony, 3 Ill L Rev 399 [1909].)

. " T see nobody on the road,’ said Alice. T only wish I had such eyes,’ the king remarked in a fretful tone. 'To be able to see Nobody! And at that distance too!’ ” (Carroll, Alice’s Adventures in Wonderland.)

. "V62.82 Uncomplicated Bereavement. This category can be used when a focus of attention or treatment is a normal reaction to the death of a loved one.” (American Psychiatric Assn, Diagnostic and Statistical Manual of Mental Disorders, op. cit., at 208.)
"Q. With respect to V62.82, uncomplicated bereavement * * * it says Tn uncomplicated bereavement, guilt, if present, is chiefly about things done or not done by the survivor at the time of death.’
"Doctor, does this V Code section refer to people who have killed their mother?
"A. Clearly — what it doesn’t — it doesn’t refer to people that killed their mother, but it could.”

. See, United States v Addison, 498 F2d 741 (DC Cir 1974); see also, Rosenthal, Nature of Jury Response to the Expert Witness, 28 J Forensic Sci 528 (1983); Imwinkelried, The Standard for Admitting Scientific Evidence: A Critique from the Perspective of Juror Psychology, 28 Vill L Rev 554 (1982-1983); also, generally, Note, The Frye Doctrine and Relevancy Approach Controversy: An Empirical Evaluation, 74 Georgetown LJ 1769 (1986); Petty and Cacioppo, Attitudes and Persuasion: Classic and Contemporary Approaches (1981).