OPINION OF THE COURT
Minna R. Buck, J.
On motion of respondents, a pretrial hearing was held concerning the admissibility in a fact-finding proceeding under *565 article 10 of the Family Court Act of certain evidence obtained through a technique known as "facilitated communication”. (See below.) At the conclusion of petitioner’s proof, respondents moved to preclude such testimony on the grounds that petitioner had failed to present a prima facie case as to its admissibility.
NATURE OF THE EVIDENCE
As described to the court, "facilitated communication” is a technique whereby the "speaker’s” hand, wrist, arm, elbow and/or shoulder is physically supported by a "facilitator.” The "speakers” (sometimes referred to as "pointers”) are individuals who are totally or partially nonverbal. Their speech impairments may stem from or be associated with various neurological, muscular and/or psychological dysfunctions; the speakers described display varying degrees of poor muscle control, which (according to one theory) plays a role in their speech impairment and is overcome through "facilitation.”
"Facilitation,” according to its practitioners, is accomplished by means of the facilitator exerting slight pressure on the speaker’s hand, wrist, etc., away from a lettered keyboard or facsimile placed in front of the speaker; the speaker thus supported exerts forward pressure against this resistance and points to or touches — usually with an index finger extended from an otherwise closed fist — a series of letters, which form the "communication.” As described by petitioner’s witnesses, the keyboard may be one of several electronic devices with a keyboard usually (but not necessarily) similar to a typewriter, or it may be a facsimile on paper or cardboard referred to as a "letterboard.” The particular electronic device used in the situations testified to is known as a "Canon communicator”; some, but not all, of these devices, incorporate a printer which records on a narrow tape the letters touched by the "pointer,” or speaker. Samples of these devices were received in evidence.
As further set forth on the record, the individual whose "facilitated communication” is at issue in this hearing is one of the subject children, a 10-year-old partially verbal child afflicted with Down’s syndrome.
SCOPE OF HEARING — THE FRYE TEST
Prior to receiving testimony, the court made the following rulings concerning the scope of this pretrial proceeding:
*566 1. Applicability of the "Frye test”
Frye v United States (293 F 1013, 1014 [DC Cir 1923]) set forth a standard for admissibility of expert scientific testimony: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.”
Notwithstanding increasing criticism of the Frye standard, at least as applicable to so-called "soft sciences,” (Giannelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later, 80 Colum L Rev 1197 [1980]; Bamberger, Let’s Think Before We Leap: Why Should the Law of Evidence be Codified?, NYLJ, May 13, 1992, at 1, col 1, at 7, col 3, and cases cited therein; People v Mooney, 76 NY2d 827, 829, n 1 [Kaye, J., dissenting 1990]; People v Burton, 153 Misc 2d 681), the test is still applicable in New York, but with an emphasis on the reliability of the evidence (People v Hughes, 59 NY2d 523 [1983]; People v Middleton, 54 NY2d 42 [1981]; People v Allweiss, 48 NY2d 40, 50 [1979]; People v Leone, 25 NY2d 511 [1969]; Matter of Jazmin M., 139 Misc 2d 731).
In applying this standard, however, a number of threshold questions are presented to the trial court: what must be accepted, who must accept it, how extensive must such acceptance be, and what evidence is acceptable to reflect the extent of acceptance?
2. What must be accepted?
Cases invoking Frye (supra) involve the validity of the underlying scientific theory or technique. New "forensic technique * * * may involve either the new application of a well-established theory or the application of a new theory. In the latter case, the theory can be validated only empirically or inferentially, not deductively * * * In terms of the Frye test, if the technique is generally accepted, then the theory must be valid although not fully understood or explainable.” (Giannelli, op. cit., at 1212.)
It has been noted that while cases use " 'validity’ and 'reliability’ interchangeably, the terms have distinct meanings in scientific jargon. rValidity’ refers * * * to accuracy [with *567 respect to technique/procedure, does it measure what it’s supposed to measure], 'Reliability’ refers to * * * its consistency. Validity includes reliability, but the converse is not necessarily true.” (Id., at 1201, n 20 [emphasis supplied].)
3. Who are the experts whose opinion on facilitated communication must be considered?
The petitioner’s witnesses stressed that facilitated communication has been utilized successfully with speech-impaired individuals who suifer from a variety of disabling conditions, including autism, Down’s syndrome and cerebral palsy, although most of the cases they discussed involved autism. The field of relevant experts may vary depending on which of several theories as to the etiology of autism (and, as argued by respondents, perhaps of Down’s syndrome as well) is adopted (People v Leone, 25 NY2d 511, 516; People v Collins, 94 Misc 2d 704, 708). In this case the court concluded that under any theory, the experts whose opinion on facilitated communication would be relevant would include psychologists, psychiatrists, speech and language pathologists, special education practitioners, and neuro-scientists (i.e., neurologists, researchers and clinicians in this field). Also included would be other clinicians or educators with experience and training in evaluating data for purposes of diagnosis, treatment or research (e.g., physicians who have diagnosed or treated patients with the aid of facilitated communication).
Petitioner also suggested that the opinions of parents who themselves use, or have observed the use of, facilitated communication with their speech-impaired children should be considered. Based on the evidence presented thus far (see below), the court now rejects this idea.
4. What is "general acceptance”?
As enunciated in case law, it need not be universal (People v Middleton, 54 NY2d 42, 49): "the test is not whether a particular procedure is unanimously indorsed by the scientific community, but whether it is generally acceptable as reliable.” (Emphasis supplied.) What constitutes "general acceptance” is apparently a matter of discretion for the trial court, since no standard more specific than that enunciated in Frye (supra) has been found in statute or case law.
5. What kind of evidence can be used to demonstrate the degree of acceptance of a scientific theory or technique?
In addition to expert testimony, scientific literature and court precedents have also been used for this purpose. (12 Am *568 Jur Proof of Facts 401, 435 [3d ed]; People v Middleton, supra, at 50; Giannelli, op. cit., at 1215 et seq.)
Although individual writings by experts in the relevant fields may be considered hearsay if introduced for the accuracy of their content, such writing would not be hearsay if introduced to demonstrate the existence and nature of published opinion by experts. (People v Hughes, supra, at 547.) Those publications would be relevant and admissible on the issue of general acceptance if they appeared in a peer-review journal in a relevant field and/or were published by acknowledged experts in the field. (Cf., People v Palmer, 80 Cal App 3d 239, 145 Cal Rptr 466 [in which the validity of a challenged technique was upheld solely on a literature search, without any expert testimony].)
QUANTUM OF PROOF
The admissibility of scientific evidence is a matter in the first instance for the discretion of the trial court (see, People v Mooney, 76 NY2d 827, supra). "If the [scientific] principle or procedure underlying its employment is not valid, then the evidence is not relevant, and, therefore, inadmissible.” (People v Burton, 153 Misc 2d 681, 683, supra; People v Cronin, 60 NY2d 430; De Long v County of Erie, 60 NY2d 296.)
This well-established rule, however, does not address the further question of the standard of proof the court should apply in determining, in this case, whether facilitated communication is generally accepted as valid within the relevant scientific community.
Respondents argue that the appropriate standard is "clear and convincing evidence” of the reliability of the proffered evidence (People v Hughes, 59 NY2d 523, supra), and it is this test — not whether the method described is valid or useful— which must be met. Petitioner argues that if some standard less than "beyond a reasonable doubt” is permitted in a criminal case, then something less than "preponderance” standard generally applicable to civil cases should be used here; on this premise, petitioner suggests that "some” credible evidence of acceptance and reliability should be sufficient.
The court rejects both these views, and concludes there is no required standard of proof set forth in statute or case law regarding the admissibility of scientific or technological evidence in civil cases. This question then is also left to the discretion of the trial court. (People v Cronin, supra; People v *569 Nieves, 143 Misc 2d 734; People v Burton, supra; People v Rivera, NYLJ, June 19,1992, at 26, col 1.)
In People v Hughes (supra), the prosecution attempted to introduce testimony from a witness whose recollection as to identification of the defendant had been refreshed under hypnosis prior to the trial. While the Hughes court took notice that hypnosis was generally accepted as a valid procedure for some purposes, it found it had not gained general acceptance as "a reliable means of restoring recollection” (supra, at 543), and therefore ruled out the hypnotically induced testimony (without enunciating the standard of proof applied). A strict standard of reliability, however, was applied to the witness’ prehypnotic recollection, on the grounds that the "unique and sometimes unfathomable consequences of hypnosis” required "clear and convincing proof’ that the prehypnotic recollection had not been tainted by the subsequent hypnosis. (Supra, at 547.)
Another recent case applying this stricter standard is People v Burton (supra), in which the defendant unsuccessfully attempted to introduce psychiatric testimony as to "acute grief syndrome,” which he claimed induced him to make a false confession. The court distinguished this from "soft” scientific evidence such as "rape trauma syndrome” (People v Taylor, 75 NY2d 277), "sexually abused child syndrome” (Matter of Nicole V., 71 NY2d 112), or "battered child syndrome” (People v Henson, 33 NY2d 63), where the relevant "field of knowledge * * * has * * * been [sufficiently] classified * * * [and] developed to be an apt subject for judicial notice” (People v Burton, supra, at 688). The Burton court then applied the "clear and convincing” standard to reliability and acceptance, and found the burden had not been met.
In both the Hughes and Burton cases (supra), it is clear each court was concerned with the fact that the testimony in question went directly to the issue of a witness’ credibility, and therefore presented the danger of confusing or prejudicing the jury. (See also, People v Williams, 6 NY2d 18; People v Rivera, NYLJ, June 12, 1992, at 26, col 1, supra.) In other criminal cases where a standard for admitting scientific testimony has been enunciated, only a preponderance of evidence was required, e.g., People v Nieves (143 Misc 2d 734, supra).
In People v Rivera (supra), the court noted it found no dispositive appellate ruling as to the standard of proof in a Frye hearing, and opined that a preponderance was probably *570 enough. It then admitted expert testimony concerning DNA evidence on the grounds that in any event, its reliability was satisfied "beyond a reasonable doubt.”
Respondents also make an analogy to Santosky v Kramer (455 US 745) in arguing for a "clear and convincing” standard. Suffice it to say the New York courts have unequivocally held that in proceeding under article 10 of the Family Court Act— unlike the termination of parental rights proceeding reviewed in Santosky — the appropriate quantum of proof even as to the ultimate issues is a preponderance of the evidence (Matter of Tammie Z., 66 NY2d 1; Matter of Linda C., 86 AD2d 356).
If a preponderance, then, is sufficient in at least some criminal cases and in article 10 cases, is it necessary — or, as petitioner claims, is "some” evidence of general acceptance and/or reliability of scientific evidence enough?
In Matter of Meyer (132 Misc 2d 415), a child abuse proceeding under article 10 of the Family Court Act, the respondent was permitted to introduce results of a polygraph test which purportedly supported his claim of innocence. The court acknowledged that polygraph evidence was generally deemed inadmissible but justified its use here on several grounds: (a) the precedents for excluding such evidence were criminal cases, where the standard of proof is higher, as contrasted to a child protective proceeding where the case "need only be proved by a preponderance of the evidence * * * and the traditional rules of evidence are significantly relaxed” (supra, at 417); and (b) because the Judge — rather than a jury — is the finder of fact, the potential for prejudice and confusion referred to in most of the exclusionary rulings is not present. The court also noted the general acceptance of expert testimony in areas of "soft science” such as "validation interviews” as corroboration of hearsay testimony of child abuse and pointed out that the polygraph evidence — unlike "validation” — would not be dispositive of the ultimate issue.
This approach was rejected in Matter of Jazmin M. (139 Misc 2d 731, supra), a child protective proceeding in which proffered polygraph evidence was excluded. The court in Jazmín criticized the Meyer ruling insofar as it was grounded on the different standards of proof in civil and criminal cases, stressing that "[i]t is the quality and reliability of polygraph evidence that is critical in assessing its probative value in a child abuse proceeding.” (Supra, at 734; see also, Matter of Dona D., 141 Misc 2d 46; Matter of Smith, 133 Misc 2d 1115, *571 affd 128 AD2d 784, lv denied 69 NY2d 613; Matter of Michelle B., 133 Misc 2d 89.)
However, with respect to the issue of the quantum of proof needed to prove reliability, neither Meyer (supra) nor Jazmin M. (supra) provides guidance. Although they reached opposite conclusions as to the admissibility of polygraph evidence, both courts accepted as given the fact that in previous cases polygraph evidence has been excluded because of the lack of general acceptance of its reliability in the scientific community.
The Meyer court, as well as petitioner in the instant case, essentially argue for application of rule 402 of the Federal Rules of Evidence: "All relevant evidence is admissible, except as otherwise provided [by rule or statute].” Some commentators have pointed out that the Federal Rules have essentially negated the Frye reliance on "general acceptance” as a prerequisite for admissibility of novel scientific evidence and permit the introduction of any relevant evidence which will "assist” the trier of fact. (See, Giannelli, op. cit, at 1228 et seq.) Whatever the merits of this approach, as noted above, the Frye standard of general acceptance is the prevailing rule in this State, with a focus on reliability in the context of the particular type of evidence under consideration. As suggested in Hughes (59 NY2d, supra, at 547), "experience and determination on a case-by-case basis will be required before procedural standards can be properly enunciated with any degree of definiteness.”
petitioner’s proof
At the conclusion of petitioner’s proof, respondents moved to preclude the introduction of evidence based on "facilitated communication” on the grounds that petitioner had not met its burden of demonstrating acceptance and reliability of the technique. The motion is timely since, as respondents point out, the rebuttal which they are prepared to present involves out-of-State experts and will involve a significant cost to them, an expense they should be spared if the petitioner has not made a prima facie case on this issue. The court has considered this motion in the same manner as a motion to dismiss under CPLR 3211 — i.e., the petitioner is entitled to every favorable inference which may be drawn from its proof.
In this hearing, petitioner presented three experts who have had direct experience with facilitated communication: a *572 speech pathologist, a psychiatrist and a special education teacher; testimony was also received from an administrator in the regional Medicaid Management Information System (MMIS) and the Director of Special Education of the Syracuse City School District, the largest school district in this county.
The three experts each testified as to their introduction in late 1989 or early 1990, to the theory and procedures involved in facilitated communication through lectures, workshops and/or writings of Dr. Douglas Biklen of Syracuse University. Mr. Christopher Kliewer, a special education teacher, gave extensive anecdotal reports of his past two years of experiences in utilizing facilitated communication with about 20 speech-impaired preschoolers, mostly four year olds; the majority of these children had been diagnosed as autistic, others had various handicaps such as cerebral palsy and Rhett’s syndrome (a progressive muscular/neurological disease) and one was diagnosed as having Down’s syndrome. He noted relatively dramatic improvements in the level and quality of communication achieved through use of facilitation in most of the children, both those who had some verbal ability and those who remained completely nonverbal, but he acknowledged that with some children the improvements were more limited. He said he observed some improvements in the behavior of the children which he attributed to their use of facilitated communication not only with himself, but also with some or all of the other members of the resource team at his school — i.e., other classroom teachers, a speech pathologist, physical therapist, student teachers and administrators. Mr. Kliewer reported further that facilitated communication was utilized by members of the Committee(s) on Special Education in developing independent individual education plans (IEP’s) for some of these handicapped children; this latter group would include teachers, parents, language specialists and psychologists (including use in IQ testing).
Mr. Kliewer is employed by a private school in the community, but he stated he knew that the majority of his former pupils went on to "regular” classrooms in local district schools, where facilitated communication had been taught to, and was used by, teachers in those classrooms.
The psychiatrist Dr. K. testified she moved to this community after learning of Biklen’s work and its implementation in schools here, in order to enroll her own autistic preschool child in such a program. She has concluded — after some initial skepticism — that facilitated communication "works,” and of *573 fered an assessment based on her expertise as a psychiatrist as to the underlying principle. She opined that facilitated communication is a means to overcome speech impairments in the case of individuals suffering from autism, by allowing them to bypass impaired limbic function of the brain; in the case of other disabilities, it overcomes "dispraxia” — a condition described as an inability to make the appropriate physical or neurological response to a verbal command even though the latter is understood. Dr. K. acknowledged, however, that she was not aware of any studies as to either of these theories as they related to facilitated communication, and that they involved premises about the nature of both autism and Down’s syndrome which differed from the current prevailing view as to the etiology of those conditions. She reported discussions with neurological scientists who were interested in pursuing such research, which were still in the formative stages.
Dr. Marilyn Chadwick, a speech pathologist, was qualified as an expert in that general field, and with respect to the use of facilitated communication. She had previously worked with autistic, speech-impaired elementary grade children and began applying the technique of facilitated communication in the diagnosis and evaluation of such children in 1990; she testified that she did not have personal experience with any young children afflicted with Down’s syndrome, although she has worked with five adults with that condition. During the past two years, she has made numerous presentations on the uses and techniques of facilitated communication to a variety of audiences throughout this State and also in Boston, New Jersey, and Montreal. Those audiences included, at various times, special education teachers, speech pathologists, physical and occupational therapists, and parents. Many of the presentations also involved a demonstration of facilitated communication with individual children as part of an evaluation as to whether or not it would be appropriate to pursue that technique in attempting to overcome the subject child’s speech impairment. Dr. Chadwick testified that about 75% of the referrals for such evaluations were made by parents; the evaluations lasted from 1 Vi to 3 hours each and in most cases were completed in a single session. She stated that of the 80 to 100 such evaluations she had performed, on only one occasion did she conclude that facilitated communication would not be appropriate for that child.
Until recently, Dr. Chadwick worked at Syracuse University, where she had been, among other things, supervising *574 graduate students working toward advanced degrees in speech pathology and language. She took a leave of absence in April 1992, with the intention of pursuing her interest in promoting the use of facilitated communication through another venue. Among the graduate students whom she had supervised, some were also using facilitated communication in their clinical work and/or gathering data as to its use. Dr. Chadwick stated that Syracuse University School of Education gave credit toward its degree for such supervised work, but that instruction in, or knowledge of, facilitated communication was not a prerequisite for a degree in that department.
Each of these experts testified, in effect, that there was no prescribed method of training facilitators. One or more methods were utilized: either by viewing a videotaped demonstration of facilitation or in person; lectures and workshops; and direct experience with a speech-impaired individual. Dr. Chadwick reported that, in some cases, a parent with no previous training was able to utilize facilitation after watching a one-hour videotaped presentation; on the other hand, some individuals never mastered the technique even when working with a child who had experience with other facilitators. They all emphasized that the physical needs of the particular child, and the relationship between that child and the facilitator was very important. What worked with one child did not necessarily work with another, even one with the same diagnosis, and a child might be able to engage in "open” communication (i.e., self-initiated, unstructured communications) with one person, but not at all with another.
Nor are there any requirements imposed by law or practice to certify the skill level of facilitators, although Dr. K. and Mr. Kliewer each testified they found the technique difficult to master. Dr. K. said she was unable to use the technique routinely with her own daughter, even though that child had apparently been able to communicate with some of her teachers through facilitation. Each of these experts referred in substance to a "trial and error” procedure that might have to be followed to achieve success. When asked how much training was required, Dr. Chadwick replied "you know you’re not doing it right if you don’t get results.”
These witnesses also addressed the related issues of monitoring the facilitation process and "validating” the results— i.e., were the communications of the child subject to suggestion or "cuing,” subconscious or otherwise, by the facilitator? All discussed methods of "self-evaluation” by the facilitator, *575 such as pulling the child’s hand back to a "neutral” position vis-á-vis the keyboard after each time the child singled out one letter, before allowing him/her to point to the next letter. They also pointed to individual incidents where a child, using facilitated communication, expressed facts previously unknown to the facilitator. However, each of the experts acknowledged concern about the possibility of manipulation by the facilitator. Dr. Chadwick testified that she had observed this once, with an inexperienced facilitator; Mr. Kliewer testified that on some occasions, with children who had severe problems of muscular or neurological control, he had utilized "hand over hand” cues, to enable the child to experience a "successful” way to communicate.
None of these experts were able to refer to any empirical studies concerning the validity of the communications or the degree to which they were subject to suggestion or interpretation. In fact, there was testimony that, notwithstanding that approximately 45 children were presently being observed and videotaped as they engaged in facilitated communication in various settings, there was no research design they were aware of which might produce any empirical data. Each of these witnesses did acknowledge their awareness of others, particularly those considered expert in the fields of autism, who either disagreed with the assumptions on which facilitated communication is based and/or called for more research to test the reliability of the technique.
Mr. Edward Irwin, the head of special education for the City schools, testified that he had also learned about facilitated communication through the work of Dr. Biklen, and was aware of and encouraged its use in the public schools for speech-impaired children. Specifically, he stated he was aware of approximately 30 Canon communicators which had been purchased by the School District in one middle and two elementary schools; these devices, costing about $600 each, were purchased by the School District based upon the recommendation of the respective Committees on Special Education that the use of such a device should be part of the IEP for a specific student. Although Mr. Irwin could not state of his own knowledge how many of these devices were purchased or used specifically for facilitated communication, he noted that none of them had been used prior to the introduction of facilitated communication into his School District.
Mr. Ronald Sharp is an employee of the New York State Department of Health. He testified that a Canon communica *576 tor is classified by Health Department regulations as a device approved for "augmentative communication” and, where properly prescribed, approved for Medicaid reimbursement pursuant to a manual received in evidence. Mr. Sharp, who reviews such requests for approval in a 14-county area, stated he was aware of at least one such approved application in the past two years previous, although he did not know whether the Canon in that instance was for the purpose of facilitated communication.
Petitioner also introduced into evidence an order issued by an Administrative Law Judge in a "due process hearing” held pursuant to regulations of the Tennessee Department of Education (Matter of L v Public Schools, Dept, of Educ. #90-47, June 27, 1991). The issue was whether L’s family was entitled to reimbursement of tuition for a private residential placement for the child in Missouri. L was at the time a 15-year-old autistic child, who had previously been believed to be "profoundly to seriously mentally retarded.” In 1989, the child was introduced to the use of a "computerized communicator designed for use by handicapped individuals” by a graduate student in the field of special education. The parents’ position was that there was evidence that this child, who was for all practical purposes nonverbal, was in fact able to read at a fifth-grade level without having had any significant instruction in reading. They introduced among other evidence, an article by Dr. Douglas Biklen which had appeared in the Harvard Educational Review; that article reported on cases which the Judge found similar to L’s, "in which it was discovered through facilitated communications that several autistic-like children possessed greater potential than previously thought.” The school’s position, prior to and at the hearing, was that they were skeptical of the validity of the techniques, suspected manipulation, and in any event there had not been sufficient observation or independent evaluation to determine whether this avenue of remediation should be pursued.
A review was ordered by an independent panel, consisting of an expert not previously involved, a school district psychologist, and Dr. Biklen, the parent’s nominee. Dr. Biklen, after viewing a video tape of the child and a facilitator, reported that "L was demonstrating authentic communication.”
Based on all the reports, the Judge found that the School District had failed to demonstrate that the alternative program they offered L was "reasonably calculated to provide L *577 with the appropriate educational benefit,” since the District failed even to explore the possibility that the child would benefit from a program utilizing facilitated communication. He noted that such a program should include "professionals with expertise in facilitated communications,” but found that the School District at that time did not have such expertise available, nor could any appropriate facility within the State be found. Based on this, an order was made immediately placing the child in the Missouri school at the School District’s expense in order to "evaluate more fully L’s communication abilities, identify the best teaching modalities * * * and to provide a highly controlled environment in order to obtain an accurate assessment of L’s potential.” The order was to remain in effect for six months, with the implication that it would thereafter be reviewed. No information was provided in the instant proceeding about further proceedings or findings in the Tennessee case.
Petitioner here also requested the court to take notice of its own rulings (N-72/3-90 and N-37/8-91, June 20, 1991) in Matter of Barbara M. and Kenneth M., an unrelated article 10 proceeding in which a witness was allowed to testify as to statements made by a child outside the courtroom using facilitated communication; that usage involved both a letter-board and a Canon communicator with a tape printer. The court notes that the hearing involving the M. children was a dispositional, rather than a fact-finding, hearing, and the testimony was purportedly proffered, not for the truth of the facts contained in the communication, but with respect to issues of credibility of another witness. The witness who testified as to her use of facilitated communication was specifically not qualified as an expert, and the court had indicated to counsel that any further evidence in this mode would require the establishment of a foundation through the testimony of experts. In any event, the ultimate issues in these cases were settled by disposition, and no further testimony was taken. To the extent such testimony was permitted, the court notes further that the witness — who had been using facilitated communication for a little over a year — indicated that in the case in question, as with others, a significant amount of interpretation was necessary with respect to the meaning of the taped letters produced by the child.
The petitioners here also offered the article by Dr. Biklen referred to above. That article, identified on this record as having appeared in the Harvard Education Review of August *578 1990, had been discussed on direct and cross-examination of each of the expert witnesses in the instant case. It apparently contained a summary of Dr. Biklen’s work to date regarding facilitated communication, as well as discussion of his experience with facilitated communication or something similar in another program in Australia, and a discussion of some of the issues raised by his findings. Although Dr. Biklen resides in this community and was included on a list of potential witnesses by the petitioner, he was not called to establish a foundation for the purpose of receiving the article into evidence and, over respondents’ hearsay objection, the court declined to receive the article in evidence. (It should be noted that Dr. K. had previously testified that the Harvard Education Review was not a peer-review journal.)
Taking the record to date as a whole, the court concludes that petitioner has not made a prima facie case as to the admissibility of testimony based on facilitated communication with a child diagnosed as having Down’s syndrome. The experts presented by petitioner did not present any coherent theory as to the underlying principle. They did indicate that the technique itself is subject to manipulation, and produces variable results with different children and different facilitators; that there is no established procedure for training, monitoring or evaluating practitioners; and that they were not aware of any empirical studies relating to the technique or its results. With the exception of one child, there was no evidence of experience using facilitated communication with children suffering from Down’s syndrome. According to petitioner’s witnesses, there is a body of opinion among experts in autism and speech impairment which questions the underlying theories embodied in the promotion of facilitated communication for use with autistic and Down’s syndrome children. All agreed more research is needed. The only legal precedent offered was the Tennessee case, which is hardly dispositive on whether or not facilitated communication is generally accepted in its field, or even reliable; that decision does no more than take note of anecdotal evidence which, in the case of that child, suggested that further study of the efficacy of the procedure should take place.
Petitioner has presented no scholarly literature about facilitated communication. What was glaringly absent from this hearing was an appearance by Dr. Biklen. He was referred to by each of petitioner’s witnesses as "the” expert in this field; indeed, all of the other proponents of facilitated communica *579 tian were described by petitioner’s witnesses as students or followers of Dr. Biklen. The court takes notice of the fact that Dr. Biklen, within several months of this hearing, had received attention in a national newspaper and on a major television network, for his work in the field of facilitated communication. Without knowing what weight might have been accorded to his testimony in this proceeding had he testified, what has been presented is simply insufficient to satisfy petitioner’s burden in this matter.
It should be pointed out that these findings do not constitute any judgment on the utility or reliability of facilitated communication. Indeed, as Dr. K. points out, professionals in many fields, including her own, often get beneficial results from experimental techniques or from established techniques without understanding why or how they work. Nor do they imply any criticism or demeaning of the motives and conduct of those who have been studying and promoting facilitated communication. Given the potential for breakthrough to understanding and possible remediating some of the tragic and mysterious conditions affecting some children, professionals and nonprofessionals alike would eagerly welcome definitive findings about facilitated communication.
The foregoing findings are limited to a determination that, in the case of the use of facilitated communication as described here, there has not been sufficient proof of its general acceptance or reliability to permit its use in a fact-finding proceeding under article 10 of the Family Court Act.