**In re the Matter of Bernard Louis STEPA-NEK, an incapacitated person, and Concerning, Louis Stepanek and Marie Stepanek, as guardians, Appellants,**

and

**Delta County and Delta County Department of Social Services, Appellees.**

**No. 94CA1691.**

Colorado Court of Appeals, Div. III.

March 7, 1996.

As Modified on Denial of Rehearing April 11, 1996.*

Certiorari Granted Oct. 15, 1996.

* Ney, J., would grant.

Mathis & Masters, L.L.C., Stephen M. Mathis, Geoffrey R. Nims, Montrose, for Appellants.

Younge & Hockensmith, P.C., Earl G. Rhodes, Grand Junction, for Appellees.

Opinion by Judge PLANK.

Louis and Marie Stepanek, parents and guardians of the incapacitated person, Bernard Stepanek, appeal from the trial court's order granting to them ⅓ of the attorney fees they had requested from the appellees, Delta County Department of Social Services (DCDSS), and from the court's finding that the county attorney is absolutely immune from any liability for his conduct in this case. We affirm.

The incapacitated person, a 41–year old man, has Down's syndrome, is severely retarded, and is non-verbal. Prior to this action, he has always lived with his parents, who were appointed his legal guardians in Colorado in 1991. During the day, he attended a sheltered workshop which provides training and assistance to the disabled.

In April 1993, the workshop staff began using a technique known as facilitated communications (F/C) with the incapacitated person. In theory, by means of F/C, a nonverbal person is able to communicate by using a letter board or a computer terminal. He or she is physically assisted by a facilitator who steadies the right arm or hand of the incapacitated person. According to F/C

proponents, the incapacitated person points to letters on the keyboard or letter board, spelling out messages.

On August 5, 1993, in an F/C session at the workshop, the incapacitated person ostensibly accused his parents of physical abuse and his father of sexually abusing him. The workshop informed DCDSS which contacted the county attorney who, that same day, petitioned the trial court for temporary guardianship for the incapacitated person. DCDSS was awarded temporary guardianship and the incapacitated person was removed from his parents' home.

Subsequently, the incapacitated person tested positive for a sexually transmitted disease, but no other indications of sexual abuse were found. Pursuant to court order, the father was tested for the same disease; however, his results were negative. During the next three months, DCDSS investigated the validity of F/C and whether the incapacitated person was actually communicating. On November 12, 1993, the county attorney filed a motion to discontinue temporary guardianship, to withdraw DCDSS as a party, and to terminate the restraining order against the parents.

The parents concurred in the motion, but requested that the trial court, prior to dismissal, grant them their attorney's fees and costs. They requested attorney's fees against DCDSS and the county attorney personally. This motion was based on C.R.C.P. 11 and § 13–17–101, C.R.S. (1987 Repl.Vol. 6A).

The court granted the motion to terminate while reserving the issue of attorney's fees. DCDSS and the county attorney contested the motion for attorney's fees based on the doctrine of absolute immunity. Thereafter, the court determined that the county attorney had absolute immunity, but found that DCDSS only had a qualified immunity, and set the matter for hearing on the issue of attorney's fees.

Following four days of testimony, the trial court partially granted the parents' motion. The trial court divided the litigation into three parts, awarding attorney's fees for the middle part, finding that DCDSS was "defi-cient by not satisfying its statutory duty to investigate in a timely fashion (i.e. immediately) and with the least restrictive intervention."

From this ruling, the parents appeal. DCDSS filed a cross-appeal alleging that it had absolute immunity, but that appeal was abandoned, as DCDSS is not now contesting the judgment entered against it.

## I.

The parents first assert that the trial court erred in determining that the county attorney had absolute immunity. We disagree.

To determine who is entitled to absolute immunity, we examine whether the action is advocatory and entitles the actor to absolute immunity, or if it is investigatory, and only provides qualified immunity. *Higgs v. District Court,* 713 P.2d 840 (Colo.1985).

Persons who are integral parts of the judicial process are entitled to absolute immunity. *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). Specifically, officials performing certain functions analogous to those of a prosecutor can claim absolute immunity with respect to such acts. *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

Prosecutors have absolute immunity when initiating formal charges and conducting the state's case to preserve the effective functioning of the trial process. *Higgs v. District Court, supra.* This immunity derives from the need to protect functions intimately related and essential to the judicial decision making process. *Awai v. Kotin,* 872 P.2d 1332 (Colo.App.1993).

However, the specific question of whether a county attorney is entitled to absolute immunity when filing guardianship petitions has not been addressed in Colorado.

In several federal decisions primarily concerning liability under 42 U.S.C. § 1983 (1988), the issue has been addressed, and we consider those rulings as instructive here.

Department of Social Services attorneys who initiate and prosecute child protective orders are the functional equivalent to prosecutors. *Walden v. Wishengrad,* 745 F.2d 149

(2d Cir.1984); *Levine v. County of Westchester* 828 F.Supp. 238 (S.D.N.Y.1993), *aff'd, sub nom. Levine v. Department of Social Services,* 22 F.3d 1090 (2d Cir.1994).

State employees who prosecute child neglect and delinquency proceedings are entitled to absolute immunity. *Myers v. Morris,* 810 F.2d 1437 (8th Cir.), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d. 58 (1987). They must be able to protect children's health and well-being without worrying about intimidation and harassment of dissatisfied parents. *Kurzawa v. Mueller,* 732 F.2d 1456 (6th Cir.1984).

In recognizing the absolute immunity of prosecutors under 42 U.S.C. § 1983, the Supreme Court found that the function of the prosecutor which most often invites action under common law torts is his or her decision to initiate the prosecution. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

The common law immunity is based on a concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his or her public duties. Further, a prosecutor could be tempted to shade his or her decisions for fear of personal liability instead of exercising the independence of judgment required by the public trust accorded to such officials. *Imbler v. Pachtman, supra.*

> The office of public prosecutor is one which must be administered with courage and independence ... [Allowing suit] would open the way for unlimited harassment and embarrassment of the most conscientious officials by those who would profit thereby ... The apprehension of such consequences would tend toward great uneasiness and toward weakening the fearless and impartial policy which should characterize the administration of the office.

*Imbler v. Pachtman,* 424 U.S. at 423–424, 96 S.Ct. at 991–992, 47 L.Ed.2d at 139–140.

The *Imbler* court concluded that the principles behind common law immunity apply to granting absolute immunity under 42 U.S.C. § 1983. If a prosecutor only has qualified immunity, then the threat of § 1983 suits would undermine performance in the exact same way that threats of suits of malicious prosecution would. The ultimate fairness of the operating of the system itself would be weakened and the public trust of the prosecutor's office would suffer. *Imbler v. Pachtman, supra.*

While the *Imbler* decision recognized that this immunity does leave the genuinely wronged without civil redress against a prosecutor whose malicious or dishonest action deprives him or her of liberty, it concluded that the alternative of granting only qualified immunity would not serve the broader public interest. "It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Imbler v. Pachtman, supra,* 424 U.S. at 427, 96 S.Ct. at 993–994, 47 L.Ed.2d at 142.

The logic applied in *Imbler* is equally applicable here. The underlying theory of filing suit under 42 U.S.C. § 1983 or moving for attorney's fees pursuant to C.R.C.P. 11 or § 13–17–101 is that the attorney has acted in such an improper manner as to require punishment.

Further, it is illogical that an attorney could be immune from suit if brought separately under 42 U.S.C. § 1983, but not immune when the fees are requested in the same action under C.R.C.P. 11 or § 13–17–101. If that were true, the immunity granted under § 1983 could simply be contravened by bringing a motion for attorney's fees in the same action.

Ultimately, a county attorney must be free to act to remove children or incapacitated adults from the home when it appears necessary without fear of personal liability. No difference exists between acting on behalf of minors or incapacitated adults.

If absolute immunity did not pertain to a county attorney for initiating proceedings to protect at-risk adults or children, the county attorney would not be able to act with the vigorous and fearless performance essential to the proper functioning of the system which must protect those who cannot protect themselves.

■ Here, the parents allege that the county attorney acted improperly by signing and filing the petition for guardianship. In filing a guardianship proceeding, a county attorney is the functional equivalent of a prosecutor. When he or she initiates a guardianship proceeding he or she is acting as an advocate. The county attorney was properly accorded absolute immunity here.

However, in so ruling, we point out that our holding here does not accord a county attorney unlimited absolute authority. Just as in *Higgs v. District Court, supra,* the county attorney's immunity, like that of a district attorney, is limited.

## II.

Second, the parents contend that, because DCDSS should not have relied upon F/C and because it had an independent duty to investigate the reliability of F/C, the trial court erred in not awarding them all their attorney's fees. We disagree.

■ At the outset we note that governmental entities are subject to sanctions for attorney fees and costs under C.R.C.P. 11 and § 13–17–101. *Board of County Commissioners v. Auslaender,* 710 P.2d 1180 (Colo.App.1985). Without assigning dates to each segment, the trial court divided the litigation into three parts: the initial filing, returning the incapacitated person to the home, and the middle, investigatory portion. The court awarded attorney fees for the middle portion.

■ The trial court found that DCDSS properly initiated the proceedings because it was objectively reasonable to do so. We perceive no error in that finding.

DCDSS has the power pursuant to § 26–3.1–101, et seq., C.R.S. (1995 Cum.Supp.) to remove incapacitated adults from their guardians. Specifically, § 26–3.1–103(1), C.R.S. (1995 Cum.Supp.) provides that:

The agency receiving a report of mistreatment or self-neglect of an at-risk adult shall make a thorough investigation immediately upon receipt of a report. The immediate concern of the report shall be the protection of the at-risk adult. The investigation shall, at a minimum, include a face to face interview of the at-risk adult alleged to be mistreated or self-neglected. The county department shall arrange for its investigation to be conducted by persons trained to conduct such investigations.

Further, § 26–3.1–104, C.R.S. (1995 Cum. Supp.) states:

(1) If the county director ... determines that an at-risk adult is being mistreated or self-neglected, or is at risk thereof, and the at-risk adult consents in writing to protective services, the county director ... shall immediately provide or arrange for the provision of protective services.

(2) ... if the at-risk adult does not contest to the receipt of protective services, the county director is urged ... to petition the court ... for the appointment of a guardian.

(3) Any protective services ... shall include only those services constituting the least restrictive intervention.

The trial court found that, on August 5, 1993, DCDSS had no reason to believe that the communications were not valid. At that time, the controversy surrounding F/C, while extant, did not have the magnitude it has today. The media attention drawing into question F/C's legitimacy occurred after the petition was filed, due in part to the parents' actions. *See generally* J.M. Hall, *Facilitated Communication: The Key to Unlocking the Skull,* 44 Syracuse L.Rev. 1059 (1993).

Additionally, the trial court determined that the case law which existed at the time of filing did not aid DCDSS in regard to initiating proceedings. *See Callahan v. Lancaster–Lebanon Intermediate Unit 13,* 880 F.Supp. 319 (E.D.Pa.1994).

When these events occurred, the few decisions which existed concerned the admissibility of F/C pursuant to the test found in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) and the admissibility of statements received through F/C indicated a split of authority. *See In re M.Z.,* 155 Misc.2d 564, 590 N.Y.S.2d 390 (N.Y.Fam.Ct.1992); *People v. Webb,* 157 Misc.2d 474, 597 N.Y.S.2d 565 (N.Y.Co.Ct.1993); *In re Luz P.,* 189 A.D.2d 274, 595 N.Y.S.2d 541 (N.Y.A.D.1993); *De-*

*partment of Social Services ex rel. Jenny S. & Mark S.,* 156 Misc.2d 393, 593 N.Y.S.2d 142, 1 A.D.D. 759 (N.Y.Fam.Ct.1992).

Further, these cases do not assist in determining whether this particular communication was invalid. Here, DCDSS had no reason to believe the communication was invalid; thus, it was required by statute to take action to protect this at-risk adult. The primary concern relative to effecting such removal cannot and should not be whether the evidence will ultimately be admissible in court. If such were the case, this concern would contravene the statutory requirement of acting to protect the at-risk adult.

When presented with the report of abuse on August 5, 1993, DCDSS was not required to do an in depth investigation into the validity of the method of communication before taking initial protective action. The parents admitted this both at oral argument and in their reply brief. Based on the information it had at the time, and in light of the fact that it had only 2½ hours to decide whether to file for guardianship or return an at-risk adult into a situation in which abuse might have occurred, DCDSS acted properly. Thus, we agree with the trial court that DCDSS acted properly in initiating the proceedings.

However, the trial court found that DCDSS did not act properly in the middle of the investigation. As quoted above, § 26–3.1–103, C.R.S. (1995 Cum.Supp.) requires that upon receiving a mistreatment report DCDSS "shall make a *thorough investigation immediately.*" (emphasis added)

The trial court interpreted this phrase to mean that the thorough investigation must be done immediately. While we agree with the result, we disagree with the interpretation.

■ A statute must be interpreted to give consistent, harmonious, and sensible effect to all its parts. *Martinez v. Continental Enterprises,* 730 P.2d 308 (Colo.1986). The primary goal in interpreting statutes is to give effect to the General Assembly's intent. To ascertain that intent, statutory terms should be given effect according to their plain and ordinary meaning. *Bertrand v.*

*Board of County Commissioners,* 872 P.2d 223 (Colo.1994).

■ Based upon these principles, we find that a more reasonable interpretation of the statute would be that once a report is made, a thorough investigation must *commence* immediately as opposed to being completed immediately. In addition, once begun, the investigation must proceed as quickly as is reasonable under the circumstances.

■ Here, although the investigation itself began immediately, we agree with the trial court that the time it took to determine that the incapacitated person was not communicating in this instance was excessive.

Once DCDSS was aware that (1) the sexually transmitted disease test done on the incapacitated person may have yielded a false positive; (2) that the father tested negative; (3) that the incapacitated person had such vision problems that he may not have been able to see the keyboard; (4) that sometimes he was apparently inattentive while typing; and (5) that the incapacitated person could not be induced to engage in F/C on a regular basis, DCDSS should have acted more quickly to resolve this issue.

The trial court found, and we agree, that this delay does satisfy the requirements of § 13–17–102(4), C.R.S. (1987 Repl.Vol. 6) for an award of attorney fees when a party unnecessarily expands the proceeding by improper conduct. However, we would note that the trial court did not find that DCDSS acted frivolously or groundlessly at any time.

Additionally, no reason existed for DCDSS not to place the incapacitated person with one of his sisters, a less restrictive alternative. Thus, we agree with the trial court that an award of attorney fees was proper for the "middle" of the case.

■ The record supports the trial court's findings that DCDSS acted properly at the conclusion of the action. Once DCDSS completed its investigation and determined that these purported communications were unreliable, it returned the incapacitated person to the home. Thus, it is not liable for attorney fees at the end of the litigation.

Finally, in regard to the amount of attorney fees, the record supports the trial court's conclusion, as to the appropriate fees based on a reasonableness standard, and thus, we will not disturb that ruling on appeal. *See Newport Pacific Capital Co. v. Waste,* 878 P.2d 136 (Colo.App.1994).

### III.

Lastly, the parents contend that all litigation involving F/C should, by its very nature, be considered as frivolous, groundless, or vexatious. We decline to accept this contention.

The trial court, in its February 8, 1994, order, asked the parties to address the issue of whether F/C was scientifically reliable and its subsequent admissibility. However, in its later order, the trial court made no findings as to either.

Thus, we are not in a position to determine whether F/C is necessarily an invalid means of communication with disabled persons. *See Callahan v. Lancaster–Lebanon Intermediate Unit 13, supra.* Hence, we cannot logically label litigation concerning it to be necessarily frivolous, groundless, or vexatious. Accordingly the judgment is affirmed.

ROY, J., concurs.

NEY, J., dissents.

Judge NEY, dissenting.

I dissent.

The majority affirms the trial court's determination that the Delta County Attorney (county attorney) is entitled to absolute immunity from sanctions to recover attorney fees for violation of C.R.C.P. 11 and § 13–17–102, et seq., C.R.S. (1987 Repl.Vol. 6A). Because I conclude that the county attorney is not entitled to absolute immunity from the Stepaneks' claims, I would remand for a hearing to determine if the county attorney violated C.R.C.P. 11 and/or § 13–17–102 to determine whether the evidence supports sanctions including an award of attorney fees against him.

The majority does not distinguish between immunity from a cause of action for damages (such as that brought in *Higgs v. District*

*Court,* 713 P.2d 840 (Colo.1985) under 42 U.S.C. § 1983 (1982)) and immunity from sanctions for violation of C.R.C.P. 11 or § 13–17–102. In my view, the imposition of sanctions against attorneys and litigants who have violated C.R.C.P. 11 or who have filed a frivolous and groundless suit is distinct from an action for damages arising from an act or acts independent of the conduct of the suit itself; the latter implicates the common law immunity principles set forth in *Higgs* and the former does not.

On August 5, 1993, the county attorney filed a motion for appointment of the Delta County Department of Social Services (DCDSS) as temporary guardian of the incapacitated person. The motion, which resulted in the removal of the incapacitated person from his home and family for ninety-nine days, was based solely upon allegations of sexual and physical abuse transmitted through facilitated communication (F/C).

F/C is a controversial procedure that is not generally accepted in the scientific community and as to which there is no standardized training, qualifications, or instruction required for facilitators. Although F/C may conceivably provide a means of communication for certain individuals, reliance upon it here appears to have no validity. Here, the incapacitated person is severely retarded, non-verbal, and has vision problems that may be so severe that they prevent him from seeing the F/C keyboard. Moreover, he has had no formal education, is not able to read, and was frequently inattentive or uncooperative during the F/C sessions.

Moreover, no controls were established to ensure that the source of the F/C messages was the incapacitated person and not the facilitator and no blind tests were used to prove the reliability of the F/C procedure. The videotape of the incapacitated person "communicating" through F/C reveals that the procedure was not structured to eliminate the possibility that the facilitator was the source of the messages.

Because of these circumstances, a conclusion that the incapacitated person was the author of the messages transmitted through F/C is, at best, tenuous. It moves to the

realm of the incredible when one recognizes that the words contained in the messages were, for the most part, spelled correctly and not spelled phonetically, as would be expected from a person who was, at best, vaguely familiar with the alphabet. Moreover, the use of sentence structure, punctuation, and paragraphs varied depending upon the facilitator, further casting doubt upon the incapacitated person's authorship of the messages.

Plaintiffs seek sanctions against the county attorney for the unsupported filing of the pleading for appointment of temporary guardian, for removing the incapacitated person from his home, and for failing to terminate the guardianship in a timely manner after it became obvious there was no evidence supporting the allegations ostensibly communicated through F/C. In light of these circumstances, I would conclude that sanctions against the county attorney may be appropriate.

The trial court noted that, although § 26–3.1–104(2), C.R.S. (1995 · Cum.Supp.) urges the county director to petition the court for an order authorizing the appointment of a guardian, the director was not licensed to practice law and was therefore reliant upon the county attorney to sign the motion for temporary guardianship. In my view, the act of signing the motion is within the scope of C.R.C.P. 11 and § 13–17–102 and renders the rules of immunity announced in *Higgs* inapplicable.

The function of immunity is to ensure the proper administration of justice and to enable officials to engage in principled decision making without apprehension of personal consequences. *See Awai v. Kotin,* 872 P.2d 1332 (Colo.App.1993); *Higgs v. District Court, supra.* However, I would conclude that immunity does not confer a license to violate the provisions of C.R.C.P. 11 with impunity.

The supreme court, through its exclusive power to make rules governing procedure in civil cases, *see* Colo. Const. art. VI, § 21; *Gold Star Sausage Co. v. Kempf,* 653 P.2d 397 (Colo.1982), has promulgated C.R.C.P. 11 which states that an attorney's signature, which is a prerequisite to filing a pleading, certifies that the attorney has read the pleadings and:

1. To the best of the attorney's knowledge, information, and belief formed after reasonable inquiry, the pleading is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and

2. The pleading is not filed for the purpose of causing delay, harassment, or an increase in the cost of litigation.

The result affirmed by the majority derogates from the power of the supreme court to regulate the conduct of licensed attorneys and would provide absolute immunity to a county attorney who utterly fails to comply with C.R.C.P. 11 (i.e. by signing and filing a pleading that the attorney has not read.)

The record indicates that the following events took place after the filing of the motion for appointment of temporary guardian on August 5, 1993, and prior to the county attorney's filing on November 12, 1993, of the motion to terminate the temporary guardianship:

1. On August 5, 1993, the incapacitated person underwent a physical examination which revealed no anal, oral, or genital lesions. The doctor concluded that there were no definite physical findings which supported the allegations of sexual abuse.

2. On August 7, 1993, a DCDSS caseworker facilitated an F/C session but no messages were communicated.

3. On August 11, 1993, the same result occurred when the incapacitated person's sisters facilitated an F/C session.

4. By August 23, 1993, the incapacitated person had tested positive for chlamydia, a sexually transmitted disease. There was some question about whether this was a false positive. Plaintiff Louis Stepanek had tested negative for chlamydia and the Delta County Sheriff's Office (DCSO) had concluded that there was not sufficient evidence to warrant further pursuit of the case against him;

5. On August 25, 1993, in the motion to continue temporary guardianship, the county attorney admitted that it was diffi-

cult to determine whether the incapacitated person was being manipulated during F/C;

6. The court-appointed visitor (visitor) later testified that by September 6, 1993, there was no corroborating evidence to support the incapacitated person's allegations of sexual abuse; and

7. On November 12, 1993, the visitor reported to the trial court her opinion that the incapacitated person was not communicating through F/C and that there were considerable differences in the speed of the typing and the content of the incapacitated person's responses depending upon the facilitator's awareness of the correct answers.

In my view, Rule 11 required the county attorney to make a reasonable inquiry to determine that the motion was well-grounded in fact. Such an inquiry would have revealed the physical limitations and inattentiveness of the incapacitated person during the F/C session and the lack of acceptance of the F/C technique. I believe that if the county attorney violated Rule 11, he is not immune from sanctions under Rule 11 or § 13–17–102.

Although I acknowledge the need for a county attorney to be able to protect the health and well-being of children and at-risk adults without worrying about intimidation and harassment by dissatisfied parents, *Kurzawa v. Mueller,* 732 F.2d 1456 (6th Cir. 1984), the final paragraph in C.R.C.P. 11 protects a county attorney after he or she has filed an emergency motion provided the attorney adequately inquires into the matter within a reasonable time and responds appropriately.

Therefore, I would remand the cause for hearing to determine if the county attorney violated C.R.C.P. 11 and/or § 13–17–102 and for the imposition of appropriate sanctions if indicated.