In re the Matter of Bernard Louis STEPANEK, an incapacitated person, and concerning, Louis Stepanek and Marie Stepanek, as Guardians, Petitioners,

v.

**DELTA COUNTY and Delta County Department of Social Services, Respondents.**

**No. 96SC299.**

Supreme Court of Colorado, En Banc.

June 23, 1997.

Mathis & Masters, L.L.C., Stephen M. Mathis, Geoffrey R. Nims, Montrose, for Petitioners.

Younge & Hockensmith, P.C., Earl G. Rhodes, Grand Junction, for Respondents.

Wilcox & Ogden, P.C., Ralph Ogden, Denver, for Amicus Curiae The Colorado Trial Lawyers Association.

Hall & Evans, L.L.C., Thomas J. Lyons, Denver, for Amicus Curiae Colorado Counties, Inc.

Chief Justice VOLLACK delivered the Opinion of the Court.

We granted certiorari to review the court of appeals decision in *In re the Matter of Bernard Louis Stepanek*, 924 P.2d 1142 (Colo.App.1996), to determine whether the court of appeals erred in granting a county attorney absolute immunity from the application of section 13–17–102, 6A C.R.S. (1987), and C.R.C.P. 11. We hold that the court of appeals correctly determined that a county attorney filing a petition for temporary guardianship of an at-risk adult is absolutely immune from a cause of action requesting attorney fees pursuant to section 13–17–102. However, we additionally hold that absolute immunity does not shield the county attorney from C.R.C.P. 11 sanctions. Accordingly, we affirm in part and reverse in part, and remand the case to the court of appeals to be returned to the district court for consideration of the C.R.C.P. 11 issue.

## I.

Bernard Stepanek (Bernie) is the eldest son of Louis and Marie Stepanek (the Stepaneks). Bernie suffers from Down's syndrome and is severely retarded and nonverbal, which makes him totally dependent upon the Stepaneks for his care. In the fall of 1991, the Stepaneks were appointed to act as Bernie's legal guardians. Soon thereafter, Bernie began participating in programs offered by Community Options, Inc. (Options), a sheltered workshop that provides various services to persons with disabilities. In the spring of 1993, Options began using facilitated communication (F/C) with Bernie. F/C is a method of aided communication involving the use of a keyboard and a facilitator who supports the disabled person's arm while the disabled person points to letters on the keyboard to spell out messages.

On August 5, 1993, Bernie, through F/C, apparently communicated that he had been sexually abused by Louis Stepanek. Options notified the Delta County Department of Social Services (DCDSS) and the Delta County Attorney, Bradley Kolman (the county attorney), who later that day petitioned the Delta County District Court for temporary guardianship over Bernie pursuant to section 26–3.1–104(2), 11B C.R.S. (1996 Supp.).[1] The

1. Section 26–3.1–104(2) provides in relevant part:

If the county director or designee determines that an at-risk adult is being or has been mistreated or self-neglected, or is at risk thereof, ... the county director is urged, if no other appropriate person is able or willing, to petition the court ... for an order authorizing the

district court granted the petition, naming DCDSS officials as Bernie's temporary guardians and enjoining the Stepaneks from having any contact with Bernie. The district court's order stated that the appointment of the temporary guardian was not to exceed six months.

That same day, Bernie underwent a complete physical examination that revealed no signs of sexual abuse. Laboratory tests on cultures and blood taken from Bernie revealed the presence of a sexually transmitted disease, but there was evidence that the test was unreliable and might have produced a false positive. In mid-August, Louis Stepanek gave oral, penile, and anal samples as part of a Delta County Sheriff's Department investigation. The results of these tests did not give any indication that Louis Stepanek had sexually abused Bernie. Subsequent attempts to communicate with Bernie using F/C proved unsuccessful on August 7, 11, and 17, 1993.

On August 25, 1993, the county attorney, on behalf of DCDSS, filed a motion to continue temporary guardianship and set a hearing in the district court. This motion recognized that the criminal investigation against Louis Stepanek had been abandoned due to a lack of evidence of sexual abuse. The motion also detailed the shortcomings of F/C by explaining that "it is difficult to determine whether or not [Bernie] is actually being manipulated by the person assisting him" and "that questions arise when one examines the facilitated communication process, if there is any validity to it at all." Despite these misgivings, the motion concluded that "[e]ven if not true the allegations apparently communicated could be evidence of problems that need to be addressed." After a telephone conference with the parties on August 30, 1993, the district court scheduled a hearing for No-

vember 15, 1993, to consider the merits of the case.

At the Stepaneks' request, Bernie was examined by an ophthalmologist in October of 1993. The ophthalmologist initially observed that Bernie's vision was 20/50; however, the ophthalmologist subsequently discovered that Bernie's answers were entirely wrong when the facilitator's view was obstructed. After examining Bernie's eyes, the ophthalmologist noted that Bernie had "severe keratoconus with extremely poor direct ophthalmoscopic view and some posterior subcapsular cataract." The ophthalmologist's report ultimately concluded that Bernie's vision was "in the count fingers range or worse" and doubted whether Bernie could even "see letters the size of those on the sheet [on which] he types his responses."

DCDSS conducted F/C testing on Bernie on November 9, 1993, six days prior to the hearing. During this evaluation, it became clear that whenever the facilitator could not hear the question, Bernie's answer was incorrect. As a result of this evaluation, the county attorney, on behalf of DCDSS, filed a motion to discontinue temporary guardianship, withdraw as a party, and terminate the temporary restraining order on November 12, 1993. The motion explained that the results of the evaluation indicated that Bernie's F/C communications were unreliable and would provide insufficient evidence to justify the county's further involvement. The motion concluded that Bernie should return home. That same day, the Stepaneks responded to the motion to discontinue temporary guardianship by requesting the assessment of costs and attorney fees against the county attorney and DCDSS pursuant to section 13–17–102, 6A C.R.S. (1987), and C.R.C.P. 11.[2]

---

provision of specific protective services and for the appointment of a guardian, for an order authorizing the appointment of a conservator ..., or for a court order providing for any combination of these actions.
§ 26–3.1–104(2), 11B C.R.S. (1996 Supp.). Because the county attorney ordinarily represents county officials in court, the county attorney filed the petition for temporary guardianship on behalf of the county director and DCDSS.

2. Section 13–17–102 provides for the award of attorney fees if the court determines that an action was substantially frivolous, substantially groundless, or substantially vexatious.

C.R.C.P. 11 provides that the signature of an attorney to a pleading constitutes a certification that, to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the pleading is well grounded in fact and is not interposed for any improper purpose. C.R.C.P. 11 also provides that, if a pleading is

The district court ruled that the county attorney was absolutely immune from the Stepaneks' fee request because the county attorney's filing of the petition for temporary guardianship "was in the nature of a prosecutorial function." The district court also found that DCDSS was entitled to qualified immunity because their involvement was investigatory in nature. In determining whether DCDSS should be liable for the Stepaneks' attorney fees, the district court concluded that DCDSS's actions in filing the petition for temporary guardianship and in conducting the initial investigation regarding the allegations of abuse were justified. However, the district court ruled that the ninety-nine days that passed before Bernie was returned home was unreasonably long.

In coming to its fee award, the district court divided the case into three stages consisting of the beginning (filing the petition and the initial investigation), the middle (continuing the investigation), and the end (testing the validity of F/C and withdrawing from the case). Based upon this formula, the district court awarded the Stepaneks one-third of their attorney fees totaling $19,318.18 for the stage encompassing the unreasonable delay in the investigation (the middle stage). The court of appeals affirmed.

## II.

### A.

The common law doctrine of absolute immunity extends to all persons who are an integral part of the judicial process. *See Briscoe v. LaHue,* 460 U.S. 325, 335, 103 S.Ct. 1108, 1115–16, 75 L.Ed.2d 96 (1983). The purpose behind a grant of absolute immunity is to preserve the independent decision-making and truthfulness of critical judicial participants without subjecting them to the fear and apprehension that may result from a threat of personal liability. *See Imbler v. Pachtman,* 424 U.S. 409, 422–24, 96 S.Ct. 984, 991–92, 47 L.Ed.2d 128 (1976). As the United States Supreme Court has explained, "[a]bsolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation." *Butz v. Economou,* 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978).

Applying this rationale, key participants in the judicial process have been granted absolute immunity. State judges are absolutely immune from liability for their judicial acts. *See Pierson v. Ray,* 386 U.S. 547, 554–55, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967); *State v. Mason,* 724 P.2d 1289, 1290–91 (Colo.1986). Similarly, witnesses testifying in criminal proceedings are entitled to absolute immunity from liability for their testimony. *See Briscoe,* 460 U.S. at 335–36, 103 S.Ct. at 1115–16; *Wagner v. Board of County Comm'rs,* 933 P.2d 1311, 1314 (Colo.1997). Additionally, administrative officials acting in a quasi-judicial role are entitled to absolute immunity. *See Butz,* 438 U.S. at 514, 98 S.Ct. at 2914–15; *State Bd. of Chiropractic Exam'rs v. Stjernholm,* 935 P.2d 959, 968 (Colo.1997). Most importantly to this case, state prosecutors have been held to be absolutely immune for their actions in initiating a prosecution. *See Imbler,* 424 U.S. at 427, 96 S.Ct. at 993; *Higgs v. District Court,* 713 P.2d 840, 851 (Colo.1985).

In filing a petition for temporary guardianship, the county attorney initiates a cause of action that is "intimately associated" with the adjudicatory process. *See Imbler,* 424 U.S. at 430, 96 S.Ct. at 995. To adequately protect the at-risk adult, the county attorney "must be able to perform the necessary tasks to achieve this goal without the worry of intimidation and harassment from dissatisfied parents" or guardians. *Kurzawa v. Mueller,* 732 F.2d 1456, 1458 (6th Cir. 1984). For these reasons, we agree with the court of appeals and the district court that the county attorney serves a prosecutorial function in filing a petition for temporary guardianship pursuant to section 26–3.1–104(2) and hold that the county attorney is absolutely immune for filing the petition and in proceeding with this cause of action. *See Myers v. Morris,* 810 F.2d 1437, 1447 (8th Cir.1987); *Kurzawa,* 732 F.2d at 1458 (hold-

---

filed in violation of this rule, the court shall impose appropriate sanctions, which may include an award of reasonable attorney fees and expenses.

ing that county attorneys who prosecute child neglect and delinquency proceedings are entitled to absolute immunity).

Most cases addressing the absolute immunity doctrine concern immunity from damages pursuant to 42 U.S.C. § 1983 (1994). The Stepaneks' cause of action is unique in that it requests sanctions, rather than damages, for the county attorney's actions in filing the petition for temporary guardianship and continuing a cause of action which was, according to the Stepaneks, meritless from its inception. Thus, the issue here is whether a grant of absolute immunity shields the county attorney from sanctions that are designed to curb attorney misconduct.

## B.

█ In response to the increasing litigation strain placed upon this state's judicial system, the General Assembly has authorized the recovery of attorney fees by the prevailing party in certain cases. *See* § 13–17–101, 6A C.R.S. (1987); *see also Wood Bros. Homes, Inc. v. Howard*, 862 P.2d 925, 935 (Colo.1993) (explaining that "the purpose underlying the award of attorney fees and costs is to deter 'egregious conduct'"). Section 13–17–102(2), 6A C.R.S. (1987), authorizes courts to award reasonable attorney fees against "any attorney or party who has brought or defended a civil action, either in whole or in part, that the court determines lacked substantial justification." Section 13–17–102(4), 6A C.R.S. (1987), defines the phrase "lacked substantial justification" to mean "substantially frivolous, substantially groundless, or substantially vexatious." A claim or defense is frivolous if the proponent can present no rational argument based on the evidence or law in support of that claim or defense. *See Western United Realty, Inc. v. Isaacs*, 679 P.2d 1063, 1069 (Colo.1984). Additionally, a claim or defense is groundless if the allegations in the complaint, while sufficient to survive a motion to dismiss for failure to state a claim, are not supported by any credible evidence at trial. *See id.*

In *Pulliam v. Allen*, 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984), the United States Supreme Court considered whether a state magistrate was immune from an award of attorney fees pursuant to 42 U.S.C. § 1988 (1994). The magistrate in *Pulliam* argued that imposing liability for attorney fees against her would have the same effect on the proper functioning of the judiciary as money damages. Although the Court found this argument persuasive, the Court ultimately held that Congress intended § 1988 to permit the recovery of attorney fees even if monetary damage claims were foreclosed by common law immunities. *See id.* at 543–44, 104 S.Ct. at 1981–81. The *Pulliam* Court explained:

> Petitioner insists that judicial immunity bars a fee award because attorney's fees are the functional equivalent of monetary damages and monetary damages indisputably are prohibited by judicial immunity. She reasons that the chilling effect of a damages award is no less chilling when the award is denominated attorney's fees.
>
> There is, perhaps, some logic to petitioner's reasoning.
>
> The weakness in it is that it is for Congress, not this Court, to determine whether and to what extent to abrogate the judiciary's common-law immunity. Congress has made clear in § 1988 its intent that attorney's fees be available in any action to enforce a provision of § 1983.

*Id.* at 543, 104 S.Ct. at 1981 (citation omitted).

█ Unlike the facts in *Pulliam*, where Congress had expressed an intent to abrogate the judiciary's common law immunity, our General Assembly has not provided a clear indication that section 13–17–102 is intended to abrogate the absolute immunity enjoyed by persons serving a quasi-judiciary function. *See Leader Fed. Bank For Sav. v. Saunders*, 929 P.2d 1343, 1348 (Colo.1997); *Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1076 (Colo.1992). Without such a legislative pronouncement, we refuse to authorize the recovery of attorney fees against a county attorney who files a petition for temporary guardianship. In this situation, attorney fees represent the functional equivalent of money damages in that they hinder the county attorney's ability to take prompt, decisive action to protect at-risk adults from

potentially abusive situations. For this reason, we hold that the county attorney is absolutely immune from the Stepaneks' fee request made pursuant to section 13–17–102.

### C.

■ C.R.C.P. 11 provides that an attorney's signature on a pleading constitutes his or her certification (1) that the attorney has read the pleading; (2) that to the best of the attorney's knowledge, information, and belief formed after reasonable inquiry, the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and (3) that the pleading is not interposed for any improper purpose. Imposing sanctions for a Rule 11 violation does not necessitate a showing of bad faith on the part of the attorney who certifies the pleading. *See Cross & Cross Properties, Ltd. v. Everett Allied Co.,* 886 F.2d 497, 504 (2d Cir.1989). Instead, sanctions are appropriate where an attorney's signed pleading fails to meet a test of objective reasonableness. *See McMahon v. Shearson/American Express, Inc.,* 896 F.2d 17, 22 (2d Cir.1990); *Cross & Cross Properties,* 886 F.2d at 504. In the event an attorney violates C.R.C.P. 11, the court "shall" impose "an appropriate sanction" upon the attorney who certified the pleading. Proper sanctions under C.R.C.P. 11 may include an order to pay the other party's reasonable expenses incurred in response to the pleading as well as reasonable attorney fees.

■ C.R.C.P. 11 safeguards the judicial process by compelling attorneys to submit pleadings which are truthful and advance meritorious legal arguments.[3] As an officer of the court, a county attorney who files a

petition for temporary guardianship must ensure, as far as reasonably possible, that the integrity of judicial proceedings is not compromised. *See United States v. Bell,* 901 F.2d 574, 578 (7th Cir.1990). As the Supreme Court explained in *Imbler,* "a prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers." *Imbler,* 424 U.S. at 429, 96 S.Ct. at 994.

■ Absolute immunity does not relieve a county attorney from the rules governing the legal profession and the manner in which adjudicatory proceedings are conducted. *See id.* at 427, 429, 96 S.Ct. at 993, 994. Placing otherwise immune attorneys above the regulation of the legal profession would give them extraordinary latitude in carrying out their duty as officers of the court. The extent of this latitude is best illustrated by the fact that an attorney held to be immune from C.R.C.P. 11 could file a pleading without ever reading it.[4] Such conduct compromises the integrity of the judicial process as well as the purpose upon which a grant of absolute immunity is founded. *See Briscoe,* 460 U.S. at 335, 103 S.Ct. at 1115–16; *Higgs,* 713 P.2d at 851. Accordingly, we hold that a grant of absolute immunity does not immunize attorneys from the imposition of sanctions pursuant to C.R.C.P. 11. *See United States v. Gomez,* 24 F.3d 924, 930 (7th Cir.1994) (ordering prosecuting attorney who signed a pleading to show cause why he should not be sanctioned for failure to comply with court's filing requirements).

■ In considering whether to levy C.R.C.P. 11 sanctions against an attorney who certifies a pleading in a court of law, a

---

3. Regarding the federal counterpart to C.R.C.P. 11, the United States Supreme Court has explained that the central purpose of Rule 11 is to deter baseless filings and streamline the administration and procedure of the federal courts. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990). The Supreme Court also explained in *Cooter & Gell* that, "[a]lthough the Rule must be read in light of concerns that it will spawn satellite litigation and chill vigorous advocacy, any interpretation must give effect to the Rule's central goal of deterrence." *Id.* (citation omitted).

4. We note that C.R.C.P. 11 provides an opportunity for attorneys to withdraw pleadings within a reasonable time after discovering that the pleading lacks merit. An attorney's initial failure to fully investigate a pleading's assertions will therefore be excused provided that the attorney conducts an appropriate investigation within a reasonable time and withdraws the insufficient pleadings once the infirmity is discovered.

court must evaluate whether the attorney (1) read the pleading; (2) undertook a reasonable inquiry into the pleading's factual and legal assertions; and (3) possessed a proper purpose in filing the pleading. By granting the county attorney absolute immunity in this case, the district court did not consider the C.R.C.P. 11 issue and the record is insufficient to permit its disposition here.[5] Remand is therefore necessary to determine whether the county attorney has violated C.R.C.P. 11.

### III.

We hold that a county attorney filing a petition for temporary guardianship of an at-risk adult pursuant to section 26–3.1–104(2) is entitled to absolute immunity from a cause of action requesting attorney fees pursuant to section 13–17–102. We further hold that absolute immunity does not insulate the county attorney from sanctions imposed pursuant to C.R.C.P. 11. Because the district court did not consider whether the county attorney violated C.R.C.P. 11, we affirm the court of appeals in part and reverse in part, and remand the case to the court of appeals with directions to return the case to the district court for a determination of the C.R.C.P. 11 issue.

SCOTT, J., does not participate.

---

**5.** The county attorney concedes that absolute immunity is not a defense to a violation of C.R.C.P. 11. However, the county attorney argues that the district court and court of appeals' findings were harmless because there was no C.R.C.P. 11 violation in this case. Contrary to the county attorney's assertions, we refuse to decide whether his actions in this case constituted a violation of C.R.C.P. 11. Such a factual determination is better left in the hands of the trial court. *See Carothers v. Department of Insts., Grand Junction Reg'l Ctr.*, 845 P.2d 1179, 1184 (Colo.1993) (explaining in the context of attorney fees that "[t]he task of weighing the appropriate factors and determining necessary fact questions is a task ill-suited for appellate adjudication.").