25CA1276 Parsons v May 06-04-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1276
Mesa County District Court No. 21CV30267
Honorable Brian J. Flynn, Judge

---

Robb Parsons,

Plaintiff-Appellant,

v.

Doug May,

Defendant-Appellee.

---

ORDER AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE LIPINSKY
Schutz and Graham*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 4, 2026

---

Wegener Lane & Evans, P.C., Benjamin M. Wegener, Grand Junction, Colorado, for Plaintiff-Appellant

Starritt Legal LLC, Sam David Starritt, Grand Junction, Colorado; Brownstein Hyatt Farber Schrek, LLP, David B. Meschke, Alex P. Jack, Denver, Colorado, for Defendant-Appellee

¶ 1 Robb Parsons appeals the district court's order awarding attorney fees to Doug May under section 13-17-102(2), C.R.S. 2025, and C.R.C.P. 121, section 1-22(2), following the court's finding that Parsons's claims against May were "groundless, frivolous, or vexatious." We affirm the district court's award of those attorney fees to May, but we reverse the court's award to May of the attorney fees he incurred in connection with Parsons's separate appeal of the court's grant of summary judgment to May. In addition, we award May the attorney fees he incurred in connection with this appeal (except those attorney fees relating to Parsons's argument regarding May's attorney fees incurred in the merits appeal) and remand to the district court to determine what amount of appellate costs, if any, to award to May.

## I. Background

### A. Parsons's Professional Relationship with Johnson and May

¶ 2 Parsons worked as an investment strategist at Wells Fargo Private Bank with Angela Johnson, a private banker, and Robert Tesch, a financial advisor. After Wells Fargo laid off Parsons in 2018, he spoke to Johnson and Tesch about forming a new business "venture."

1

¶ 3     The participants in the venture contemplated that, after leaving Wells Fargo, Johnson would refer her private banking clients to Parsons and Tesch for investment advisory services. To facilitate the venture, Parsons and Tesch joined WealthSource Partners, LLC — an investment advisory firm — and Johnson left Wells Fargo to join Timberline Bank as a private banker. Doug May was another financial investment advisor at WealthSource.

¶ 4     The venture was documented in a solicitation agreement between WealthSource and Timberline. Under the agreement, WealthSource would pay Timberline a fee for referring private banking clients to WealthSource. Notably, Parsons was not a party to the agreement, nor did he "own" any of the clients with whom he worked at WealthSource. The clients were free to move their money to the other investment advisors at any time. Parsons worked with the WealthSource clients whom Timberline referred to him, but he did not contract directly with the clients.

### B.     Parsons's Arrest and WealthSource's Termination of His Employment

¶ 5     In August 2021, Parsons was arrested for violating a protection order in a domestic relations case and served six days in

jail.  Parsons told Johnson that he was in jail.  Parsons did not immediately inform WealthSource of his arrest or that he had been under criminal investigation for nearly two years before his arrest, even though he was required to "promptly" disclose if a third party "initiated an examination, inquiry, review, investigation, proceeding, or action" against him that "may have resulted in disciplinary action."

¶ 6     A week after Parsons's arrest, Johnson informed May of the arrest.  May passed along this information to WealthSource executives.  WealthSource then terminated Parsons's employment.

### C.     Emails Between May and Johnson

¶ 7     We review in detail the email exchanges between Johnson and May in March and April 2021 because Parsons rested his claims on them.  But both the district court and the division of this court that affirmed the grant of summary judgment (the merits division) concluded that the emails did not support Parsons's claims.  *See Parsons v. Timberline Bank,* (Colo. App. No. 24CA0257, Dec. 5, 2024) (not published pursuant to C.A.R. 35(e)).

¶ 8     In the emails, which predated Parsons's arrest, Johnson expressed frustration with her working relationship with Parsons.

3

Johnson perceived May as a mentor and sought his advice on career decisions.

¶ 9    In an email to Johnson, May advised her as follows:

> What I'm saying is that in the event you felt like it was in clients['] best interest[s] to move QUICKLY away from [Parsons], the best bet would be to line up something with one of these outside firms, rather than create your own [Registered Investment Advisor] or create an alternative within the WealthSource universe.
>
> Hopefully, that's not something that will need to happen.  If it did, however, I could make some introductions.
>
> This email will self-destruct (I wish) in [fifteen] seconds. . . .  No, didn't happen?  Darn.
>
> For the record to anyone reading this in the future — I want what is best for clients and, second, what is fair to everyone involved.

¶ 10    May later sent Johnson an email summarizing her career goals and offered suggestions for advancing herself professionally after Parsons retired from WealthSource:

> Your goals for designing [Timberline] are complex, as you are looking for a solution that is advantageous to yourself, [*Parsons*], me, a new person, [Timberline][,] and even WealthSource.
>
> The suggestion I've outlined provides [Johnson] with additional support from the

new WealthSource advisor, will increase her compensation through the 25% solicitation fee that Timberline would receive on the $40MM book of business (perhaps $60K-75K/year), and it will give her a slice (10-20%) of the TLWM de novo [Registered Investment Advisor] that would ultimately be launched to manage this book of business.  By getting a new successor WealthSource advisor in the mix, now, there will be greater client satisfaction and retention *when [Parsons] ultimately decides to transition out* and it provides capacity, now lacking, to continue building a larger book of business, including smaller mass affluent accounts.

[Parsons] will be able to enjoy his easy schedule and terrific salary for a longer period of time, without worrying about the problems created by the lack of support he is providing [Johnson].  While monetizing the book of business is nice, the longer he can relax with his $750K gig, the better off he'll be because he will always have the monetization option at the end.  However, he will also have to reduce his current level of compensation in order to lock in "easy street."  He will not want to do this, but his alternative is that he and a new Timberline entity go head to head to compete for the clients, which simply leaves both parties worse off.

. . . .

My personal belief is that this proposed solution is a Win-Win-Win-Win-Win-Win.  The greatest difficulty will be getting [Parsons's] agreement.  However, this difficulty is not a reflection of the quality of the proposal, so

much, as the fact that [Parsons] is now getting the lion's share of the economic benefits of leaving Wells Fargo, while [Timberline] ([Johnson]) is doing much of his work for him. The unfairness of the status quo naturally leaves him feeling like he will be disadvantaged by this proposal. However, if the status quo cannot continue for much longer, and if he will be much worse off if he fails to renegotiate and the current working relationship dissolves, along with the current partnership, then he (and WealthSource) will be much worse off if he doesn't agree to renegotiate the original terms.

If the attempt to negotiate a more equitable partnership agreement with [Parsons] fails, then [Johnson] and [Timberline] have other options, however it is difficult to imagine that those options will incorporate WealthSource Partners in the vendor mix and these "hard ball" alternatives are not discussed here.

(Emphasis added.)

### D.    Procedural History

¶ 11    In October 2021, Parsons filed suit against May, Johnson, Timberline, and WealthSource, asserting, among other claims, defamation and intentional interference with existing contractual relationships with Parsons's clients. Specifically, Parsons alleged that, after WealthSource terminated his employment, May, Johnson, Timberline, and WealthSource "induced" the clients with

6

whom Parsons had worked to keep their business with Johnson and WealthSource, causing the clients to "end their investment relationships/contracts" with Parsons. (Parsons's claims against Johnson, Timberline, and WealthSource are not at issue in this appeal.) He later amended his complaint to add a civil conspiracy claim. Parsons attached the emails between May and Johnson as exhibits to his complaint and, later, his amended complaint.

¶ 12 In January 2023, May moved for summary judgment on all of Parsons's claims against him. Although Parsons voluntarily dismissed his defamation claim against May during the pendency of the motion, he persisted in litigating his contractual interference and civil conspiracy claims against May.

¶ 13 The district court granted May's summary judgment motion, stating that it could "not find any evidence" to support Parsons's contractual interference claim and that Parsons had not pleaded a prima facie civil conspiracy case. Specifically, the court found that the emails between May and Johnson were no more than "thoughts offered by [May] as to alternatives that might benefit [Johnson]" and merely reflected "thinking out loud." Further, the court found that the emails did not support any element of Parsons's civil conspiracy

claim, as they were "simply discussions about hypothetical proposals that were never agreed upon." These findings were central to the district court's later determination that Parsons's claims lacked substantial justification.

¶ 14 In February 2024, Parsons appealed the district court's order granting summary judgment to May (the merits appeal). In December 2024, the merits division affirmed the order. *See Parsons*, No. 24CA0257, slip op. at ¶¶ 32, 35.

¶ 15 Before Parsons filed the merits appeal, May filed a motion in the district court for an award of his attorney fees under section 13-17-102. The parties agreed to bifurcate the issues of (1) May's entitlement to attorney fees under section 13-17-102 and (2) the reasonableness of May's fee request.

¶ 16 In an order dated November 12, 2024, the district court determined that May was entitled to an attorney fee award under section 13-17-102 because Parsons had prosecuted "groundless, frivolous, or vexatious" claims against him. The court found that, "[w]hile [May's] motion seeking summary judgment was pending for [eleven] months, [Parsons] continued with litigation . . . despite [Parsons] being on clear notice as to the lack of any evidence

supporting the claims." It further found that Parsons "had literally nothing to support his claims against [May] from the outset of the lawsuit"; Parsons "acted in bad faith in pursuing claims against [May]"; and Parsons pursued those claims "out of a naked desire to prevail against May, with not a shred of evidence to support [his] theories of defamation, intentional contractual interference, and civil conspiracy."

¶ 17    The district court subsequently found that the amount of May's fee request was reasonable and ordered Parsons to pay May $118,327.91 in attorney fees, including $7,522.50 in appellate attorney fees for May's defense of the merits appeal.

¶ 18    In this appeal, Parsons contends that the court abused its discretion by awarding attorney fees to May because Parsons's claims were not frivolous, groundless, or vexatious. He also contends that the court erred by awarding appellate attorney fees to May because May did not request such attorney fees in the merits appeal.

## II.    Analysis

### A.    The Court Did Not Abuse Its Discretion by Awarding Attorney Fees to May Because Parsons's Claims Against May Lacked Substantial Justification

#### 1.    Standard of Review

¶ 19    "We review a [district] court's decision to award attorney fees for abuse of discretion." *1046 Munras Props., L.P. v. Kabod Coffee*, 2025 COA 71, ¶ 23, 577 P.3d 1033, 1038 (quoting *Nesbitt v. Scott*, 2019 COA 154, ¶ 16, 457 P.3d 134, 137).  A court "abuses its discretion if the award is manifestly arbitrary, unreasonable, or unfair." *Id.* (quoting *Nesbitt*, ¶ 16, 457 P.3d at 137).  "Whether attorney fees are reasonable is a question of fact for the trial court; thus, we will not disturb its ruling on review unless patently erroneous and unsupported by the evidence." *Id.* (quoting *Nesbitt*, ¶ 16, 457 P.3d at 137).

¶ 20    Subject to limitations not relevant to this appeal, in any civil action, "the court shall award, by way of judgment or separate order, reasonable attorney fees against any attorney or party who has brought or defended a civil action, either in whole or in part, that the court determines lacked substantial justification." § 13-17-102(2).  A claim lacks substantial justification if it is

"substantially frivolous, substantially groundless, or substantially vexatious." § 13-17-101.5(1), C.R.S. 2025.

¶ 21 A claim is substantially frivolous if the party asserting it "can present no rational argument based on the evidence or law in support of that claim." *In re C.E.S.K.*, 2025 COA 51, ¶ 43, 573 P.3d 119, 128 (quoting *Stepanek v. Delta County*, 940 P.2d 364, 369 (Colo. 1997)). "A claim is groundless 'if the allegations in the complaint, while sufficient to survive a motion to dismiss for failure to state a claim, are not supported by any credible evidence at trial.'" *State ex rel. Coffman v. Robert J. Hopp & Assocs., LLC*, 2018 COA 71, ¶ 29, 422 P.3d 617, 624 (quoting *Stepanek*, 940 P.2d at 369). And "[a] claim is vexatious if it is brought or maintained in bad faith. Bad faith may include conduct that is arbitrary, abusive, stubbornly litigious, or disrespectful of the truth." *In re Marriage of Roddy*, 2014 COA 96, ¶ 34, 338 P.3d 1070, 1077 (citation omitted).

¶ 22 "In determining whether to award attorney fees under section 13-17-102 and the amount of such award, the court must consider the relevant factors in section 13-17-103(1), C.R.S. [2025], and explain how those factors justify a fee award." *C.E.S.K.*, ¶ 44, 573 P.3d at 128. The factors include:

(a)     The extent of any effort made to determine the validity of any action or claim before said action or claim was asserted;

(b)     The extent of any effort made after the commencement of an action to reduce the number of claims or defenses being asserted or to dismiss claims or defenses found not to be valid within an action;

(c)     The availability of facts to assist a party in determining the validity of a claim or defense;

. . . .

(e)     Whether or not the action was prosecuted or defended, in whole or in part, in bad faith;

(f)     Whether or not issues of fact determinative of the validity of a party's claim or defense were reasonably in conflict; [and]

(g)     The extent to which the party prevailed with respect to the amount of and number of claims in controversy.

§ 13-17-103(1)(a)-(c), (e)-(g).

¶ 23     The district court, however, "need address only those factors that are relevant to the circumstances involved in the case." *In re Marriage of Ensminger*, 209 P.3d 1163, 1166 (Colo. App. 2008).

### 2. Parsons Presented No Evidence to Support His Claims Against May

¶ 24 Parsons contends that his claims against May were "based upon rational theories which were based upon actual evidence." We disagree.

¶ 25 Parsons argues the district court erroneously "weigh[ed] the creditworthiness of the evidence" rather than "determin[ing] whether the evidence was capable of being believed and supporting a factual finding." This statement, however, mischaracterizes the district court's findings. In both the order granting May's summary judgment motion and the order awarding attorney fees to May, the district court found that *no evidence* supported Parsons's claims against May. A court does not weigh the credibility of evidence by determining that a claim lacks any evidentiary support. *See Hall v. Indus. Claim Appeals Off.*, 757 P.2d 1132, 1133 (Colo. App. 1988).

¶ 26 The merits division confirmed that Parsons presented no evidence to support his claims against May. The division noted that Parsons

- could not "avoid summary judgment by merely asserting a fact *without evidence* to support it," *Parsons*, No. 24CA0257, slip op. at ¶ 25 (emphasis added);

- "provided *no evidence,*" "no affidavits," and "nothing in the record" to support his claims for contractual interference, *id.* at ¶¶ 28-30 (emphasis added); and

- presented no evidence "to show that anything discussed" in the emails "came to fruition" and, contrary to Parsons's contention, the emails "contain[ed] *no evidence*" of contractual interference, *id.* at ¶ 31 (emphasis added)).

¶ 27    The merits division therefore concluded that the district court did not err by entering summary judgment against Parsons because his contractual interference claim lacked evidentiary support. And because Parsons could not prove that claim, he also "failed to prove the . . . wrong" underlying his civil conspiracy claim. *Id.* at ¶ 35.

¶ 28    In this appeal, Parsons points to no evidence other than the emails between May and Johnson to contest the district court's finding that his claims against May lacked substantial justification. And, as in the merits appeal, he fails to "identify any specific

14

communication . . . that states, much less suggests," that May engaged in wrongful conduct. *Id.* at ¶ 21.

¶ 29 We agree with the district court and the merits division that Parsons's claims lacked evidentiary support and, therefore, were substantially groundless. *See Coffman*, ¶ 29, 422 P.3d at 624. We need not decide whether the claims were also substantially frivolous and substantially vexatious because a district court may award attorney fees based on a finding that a claim lacked substantial justification under any one of the three bases in section 13-17-102(2). *See Freed v. Bonfire Ent. LLC*, 2024 COA 65, ¶ 43, 556 P.3d 817, 826-27 ("When the drafters of a statutory section separate elements with punctuation and the disjunctive 'or,' that ordinarily demarcates different categories.").

¶ 30 Furthermore, applying section 13-17-103, the district court found that, although Parsons dismissed his defamation claim, he "persisted" in litigating his contractual interference and civil conspiracy claims "even after the discovery process had failed to substantiate" them. The court also found that, during the pendency of the summary judgment motion, Parsons continued to

litigate "despite . . . being on clear notice as to the lack of any evidence supporting the claims."

¶ 31   Thus, the district court did not abuse its discretion by finding that Parsons's claims against May lacked substantial justification and, therefore, awarding attorney fees to May under section 13-17-102(2).

### B. Appellate Attorney Fees in the Merits Appeal

¶ 32   The district court's award to May included $7,522.50 in attorney fees that he incurred in connection with Parsons's merits appeal. Parsons contends — and May concedes — that the district court erred by awarding these attorney fees because May did not request an award of appellate attorney fees in the merits appeal. *See Sullivan v. Lutz*, 827 P.2d 626, 629 (Colo. App. 1992). This error only affects the portion of the attorney fees attributable to the merits appeal; the remainder of the district court's attorney fee award is unaffected. Accordingly, we reverse the portion of the district court's order awarding $7,522.50 in appellate attorney fees to May and reduce the fee award to $ 110,805.60.

## C. May's Request for Attorney Fees and Costs Incurred in This Appeal

¶ 33    May requests an award of a portion of the appellate attorney fees and costs he incurred in this appeal under C.A.R. 28(b), C.A.R. 39.1, and section 13-17-102(2). Specifically, he requests an award of the attorney fees and costs he incurred while defending, in this appeal, the attorney fees he was awarded *in the district court.* He does not seek the attorney fees he incurred in this appeal to respond to Parsons's argument regarding the district court's award of the attorney fees May incurred *in the merits appeal*, however. We grant May's attorney fee request.

¶ 34    Because both parties prevailed, in part, in this appeal, we remand to the district court to determine what amount of appellate costs, if any, to award to May. *See* C.A.R. 39(a)(4) ("[I]f a judgment is affirmed in part, . . . costs are taxed *only* as ordered by the *trial court.*" (emphasis added)); *Grant Bros. Ranch, LLC v. Antero Res. Piceance Corp.*, 2016 COA 178, ¶ 36, 409 P.3d 637, 645.

¶ 35    "Under section 13-17-102, an award of fees on appeal is appropriate only in clear and unequivocal cases where no rational argument is presented and, thus, the appeal is frivolous." *In re*

*Estate of Shimizu*, 2016 COA 163, ¶ 34, 411 P.3d 211, 219. As discussed above, in this appeal, Parsons presented the very same emails that the district court and the merits division determined provided "no evidence" to support his claims against May. And we agree with May that Parsons's appellate argument with respect to the award of May's attorney fees incurred in the district court merely consists of the conclusory assertion that his claims were based on "a rational theory and legal causes of action, including [the emails]."

¶ 36    For these reasons, we award May his reasonable attorney fees incurred in this appeal (except the attorney fees related to the award of appellate attorney fees for the merits appeal) and remand the case to the district court to determine the reasonable amount of those attorney fees. *See In re Estate of Beren*, 2013 COA 166, ¶ 18, 321 P.3d 615, 619.

### III.    Disposition

¶ 37    We affirm the district court's order awarding May the attorney fees he incurred in defending against Parsons's claims in the district court, reverse the portion of the order awarding May the attorney fees he incurred in connection with the merits appeal, and

18

remand the case to the district court to determine the amount of reasonable appellate attorney fees May incurred in connection with this appeal (except May's attorney fees related to the award of appellate attorney fees for the merits appeal) and to consider May's request for an award of his appellate costs.

JUDGE SCHUTZ and JUDGE GRAHAM concur.